No. 35,970

HENRY BENNETT and OPAL LANTERMAN, *Appellees*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellant*.

(142 P. 2d 810)

Opinion filed November 6, 1943.

*Richard B. McEntire, Kenneth W. Wagner,* both of Topeka, and *Harold Medill,* of Independence, argued the cause for the appellant.

*R. C. Russell,* of Great Bend, and *Alden E. Branine,* of Newton, argued the cause, and *John Henry Lewis, Isabel Obee,* both of Great Bend, *Ezra Branine, Fred Ice* and *John P. Flinn,* all of Newton, were on the briefs for the appellees.

The opinion of the court was delivered by

HOCH, J.: This case arises under the oil-proration law. Oil in

excess of the "allowables" having been produced from certain wells, the State Corporation Commission issued an order charging the overage to the lease from which it had been produced. On appeal by the lessee and operator the district court set aside the order and the commission appeals. Was the order valid?

The material facts can be briefly stated. In February, 1942, the commission instituted an investigation into alleged violations of its oil production orders by a number of oil operators. Among the leases from which, it appeared, oil in excess of the "allowables" had been produced was the "Steckel Lease" in the Silica-Arbuckle pool in Rice county. Henry Bennett, appellee here, was lessee and opera-tor of the five producing wells on the lease. At a hearing before the commission on March 23, 1942, the following stipulation was entered into:

### STIPULATION

"In connection with the Steckel Lease in the Silica-Arbuckle Pool of Rice .county, Kansas, owned and operated by Henry Bennett, it is stipulated and agreed by Harold Medill, general counsel for the Commission, on one hand, and Fred Ice as attorney for Henry Bennett, on the other hand, that the assessment of costs made by the commission in accordance with the stipulation, that Henry Bennett shall be assessed his proportion of the costs in the above-entitled matter, which shall be in the amount of $500, without prejudice as to the rights of the said Henry Bennett on the hearing concerning overage, which hearing is continued and liability for said overage denied, for the reason that the oil taken from said lease was stolen and was produced and taken without the knowledge of the said Henry Bennett, the amount taken being 26,386 barrels, which was unreported to the Commission by the Falcon Refining Company, the purchaser of said oil. The said Henry Bennett having received no part of the returns from the sale of said oil.

/s/ Harold Medill,
General Attorney for the
State Corporation Commission.

/s/ Fred Ice,
Attorney for Henry Bennett."

On the same day the commission made the following findings:

"The Commission finds that by the stipulation entered into between counsel for the commission and Henry Bennett, the amount of costs that should be assessed against Henry Bennett by reason of said investigation conducted by the commission in reference to the Steckel Lease in the Silica-Arbuckle Pool of Rice county, Kansas, was agreed to as being the sum of $500, but that the question of the overage to be charged against said lease, amounting to 26,005 barrels, should be continued for the purpose of permitting said Henry Bennett to *introduce testimony as to whether said oil should be charged against said lease as overage* since it was produced and taken from said lease without the

knowledge of said Henry Bennett and for which said Henry Bennett received no compensation." (Italics supplied.)

Appropriate order was issued and further hearings were held on May 21, 1942, at which all interested parties were present or represented by counsel, and evidence was received. It is unnecessary to review the evidence.

On June 17, 1942, the commission made its findings and issued the order here involved. We quote from the findings:

"That the overages of 26,005 barrels, as stipulated to herein as having been produced from said Steckel Lease in the Silica-Arbuckle Pool of Rice county, Kansas, in violation of the rules, regulations and orders of the Commission, should be, in order to protect the correlative rights of the producers in said pool, charged against said Steckel Lease and said lease required to make up said overages from current and future allowables. The fact that said oil was produced and sold from said lease without the knowledge or consent of Henry Bennett and the fact that he received no compensation therefor does not justify this Commission in canceling said overages. Under the law it is the duty of this Commission to regulate the production of crude oil from the wells and leases in the prorated pools of this state so that each and every operator in such pools shall receive his fair share of oil from the common reservoir measured by the standard set forth in the statute and the rules and regulations of the Commission duly promulgated by this Commission. . . .

"There was testimony introduced to the effect that the excess oil produced from the Steckel Lease was stolen from said lease by the pumper and by others with the pumper's knowledge and that Henry Bennett, operator of said lease, was free from negligence in his management and supervision of said lease. Whether Henry Bennett did or did not exercise that degree of care and supervision of the production of oil from his lease that a prudent and reasonable operator would have exercised under the circumstances is beside the point. The Commission prefers to hold and base this opinion not on the question of negligence of supervision of the lease, but rather on the ground that the statutes under which production is regulated make it the duty of this Commission to charge against the wells and leases from which production is had the oil produced therefrom irrespective as to whether it was produced with the knowledge or consent of the operator or whether the operator was negligent or free from negligence in permitting the oil to be produced from the lease. We hold that the Commission is without power to judicially pass upon the property rights of the operators or to take the production of one operator and transfer it to another. It is within the common knowledge of those engaged in the oil business that where a well or lease is permitted to overproduce its ratable share of oil from the common pool, such excess oil that is produced results in the migration or drainage of a like amount of oil from neighboring leases to the one that is overproduced. Hence, if we were to hold that the overproduction of the Steckel Lease should be canceled and not charged against that lease, we would be in substance holding that the loss suffered by Mr. Bennett through the malfeasance of his pumper and others should be rectified by him keeping

the oil that has been drained from his neighbors with an opportunity to produce same at a later date. The statute confers no such power on this Commission.

"For the reasons stated it naturally follows that the motion of Henry Bennett to cancel and set aside the overages, stipulated to as having been produced from the Steckel Lease, should be overruled and denied; that said lease should be charged with said overages produced therefrom in the amount of 26,005 barrels and the records of this Commission should be corrected to reflect such overages."

For clarification it may be noted that while the figure "26,386 barrels" is used in the stipulation, the "overage" was computed at 26,005 barrels and that is the figure used by both parties.

Appeal to the district court having been taken the matter was there heard on May 5, 1943, upon the record made before the commission. In its opinion, filed May 7, 1943, the court narrated the history of the proceedings before the commission, stated that it seemed to be admitted by all parties that the oil was pumped from the Bennett well by a pumper employed by him; that the tanks on the premises were connected with a pipe line through which Bennett delivered the oil to the purchasers; that the pumper in charge, pumping the oil, "permitted others to come to the well in trucks and haul oil away, unbeknownst to Henry Bennett, the owner"; that the oil so trucked away was sold to the Falcon Refining Company at Great Bend, Kan.; that the stipulation (supra) amounted to an express agreement that the amount of oil therein stated had been produced, and that Bennett was bound by the stipulation and the court would not be justified in sending the matter back to the commission to take testimony as to the number of barrels taken; that the court was satisfied that Bennett was not a party in any manner to the theft of the oil and had he known it was being stolen from his lease he would have promptly stopped it; that "the court also feels he was not negligent in the manner in which he was operating the lease in permitting the oil to be taken by the thieves and the pumper"; that "at one time Mr. Bennett heard a rumor that oil was being hauled off his lease and he employed a man and kept him at or near the lease for a week, with a view of discovering whether or not oil was being taken and no oil appears to have been taken during that time"; that the pumper was not authorized to sell oil except through the pipe line; that the pool where the lease was located was of such a nature that oil may be drained about 1,300 feet from a producing well, and that "there-

fore some of this oil that was stolen through the Bennett well must have come from other leaseholders." On this premise the court reached its conclusions as follows:

"If the 26,005 barrels overage is enforced against the plaintiff Bennett, and his well shut down until the leases around him produce an amount sufficient to equalize production in the pool, it will necessarily follow that some of the surrounding wells would draw oil from the Bennett lease, and he would therefore be making up oil stolen by these parties from the offset well of other parties. That would be manifestly unfair to Mr. Bennett.. Bennett had nothing whatever to do with stealing the oil and received no benefit from the stolen oil, and if oil was taken from his lease by the offset wells of other parties from the Bennett well, it would only mean that the commission would be causing Mr. Bennett to stand additional loss than that which he already has sustained. The court doesn't think that should be done. The commission manifestly has no jurisdiction to restore oil stolen through the Bennett well from the offset wells, by making an order, the effect of which would allow the offset wells to recover their stolen oil from the Bennett well. Only a court of competent jurisdiction would have a right to make Mr. Bennett furnish oil to the owners of the offset well equal to the amount which was stolen from them through the Bennett well.

"This court is of the opinion that the commission should not have charged the 26,005 barrels stolen from the lease as overage against the plaintiff's lease, and that the order of the commission charging said overage should be set aside and the judgment of this court rendered accordingly."

The court set aside the order charging the overage to the Steckel Lease, directed that such overages be canceled, and that "the plaintiffs herein be *restored to their allowable rights as of the time of the entering of the said decision.*" (Italics supp.)

We first note appellant's contention that Opal Lanterman, who joined with Bennett in the petition for review, was not a proper party, not being "a person aggrieved" within the meaning of section 55-606, G. S. 1941 Supp., which provides for judicial review of commission orders. Opal Lanterman holds the royalty interest under the Bennett lease and having no right to produce was not a party to the proceedings before the commission. In view of the decision herein reached on the principal issue we need not determine this question. However, we shall hereinafter refer only to Bennett as appellee.

It may promote clarity by first stating some matters not at issue. It must be accepted that 26,005 barrels of production were taken from the Steckel lease in excess of the proration allowables. This overage was produced by appellee's pumper and employee. While appellee raises some question as to the intent and proper interpreta-

tion of the stipulation as to the number of barrels of overproduction, we think the district court properly interpreted the stipulation. In any event no cross-appeal was taken from the court's finding and appellee is bound by it. Further, appellee does not attack the regularity of the proceedings before the commission nor the validity of the proration law, nor the power of the commission to make reasonable rules and regulations; nor does he deny that an existing rule provides for action to be taken in case of overages. Nor, as we understand his position, does he question the power or duty of the commission to shut in wells or restrict their production until excess production has been wiped out and production equalized among the operators within the pool. His contention is that since the overproduction was without his knowledge or consent, and since he received no return from the sale of the stolen oil, the commission's order was inequitable and invalid. To this should also be added his contention that he was absolved from negligence in supervising operations under the lease. On that we do not find the record quite so convincing as appellee contends. The commission made no finding on the question of negligence, taking the position that negligence in supervision or lack of it could not be a controlling factor, under the law; that operators were responsible for the production under their leases and that if there was overproduction the overage could only be charged to the lease from which it was produced. The trial court said in its opinion that it "feels he was not negligent in the manner in which he was operating the lease in permitting the oil to be taken by the thieves and the pumper." We think it unnecessary to review at length the evidence upon this point. Appellee testified that his pumper was not required to keep any record of production and made no daily, weekly, or other reports. He further testified that at one time he became suspicious, having heard that oil was being hauled off the lease, and employed a watcher for a week. He visited the lease twice a month, on the average. The evidence was that the excess oil was hauled away from the lease in trucks over a period of two years or more.

Broadly stated, section 55-603, 1941 Supp., provides that when the full production from any oil pool cannot be had without constituting waste, or without injury to the correlative rights of other producers from the pool, or without unreasonable discrimination against other pools in the state, no person having a right to produce from the pool shall currently produce therefrom more than the pro-

portion which the productivity (commonly called "potential") of his well or wells "considered in connection with the acreage reasonably attributable to each thereof" bears to the total productivity of all the wells therein. We are not here concerned primarily with the question of waste or with discrimination between pools, though those questions are indirectly involved. We are directly concerned with proration as a means of securing to each producer his fair share of the oil produced from a common reservoir—or, as the statute has it, "the respective correlative rights of the producers therein." Any production from the pool in excess of the producer's fair share—as determined by the commission—is unlawful production.

It is not necessary to take note of the extended provisions for enforcement of the act. (See particularly G. S. 1941 Supp. 55-604, 55-605, 55-606.) Suffice it to say that the commission is directed to so regulate production of oil as to effectuate the purpose of the act, and is "given jurisdiction and authority over all matters involving the application and enforcement of this act, and shall have authority to make and enforce rules, regulations, and orders for the prevention of waste as herein defined and for carrying out and enforcing each and all of the provisions of this act," etc. (G. S. 1941 Supp. 55-604[a].)

Under the rules and regulations duly promulgated the commission issues monthly production orders fixing the allowable production for the succeeding month or other period for the various wells and leases subject to the law. It is not denied that the monthly production orders of the commission fixed the amount of oil for each production period that could lawfully be produced from the Steckel lease, during the two years or more in which appellee's pumper was producing this twenty-six thousand barrels of excess oil and receiving a part of the returns from those with whom he was conniving in its sale.

The commission's rule 113 deals with the matter of overages and provides in part:

"Wells or leases which have produced in excess of their allowable for any allowable period shall discontinue production until such overproduction has been equalized by deductions from future allowables established either for the wells involved or the leases upon which they are located. Whenever the commission shall find that the overages charged against any well cannot be fully absorbed by it, *such overages shall be charged against the lease upon which such well is located and shall be absorbed by deductions from the future allowables established for all of the wells located thereon,* irrespective of

whether any or all of such other wells are in existence at the time of the accrual of such overage." (Italics supplied.)

The method provided in the rule has long been an established procedure for equalizing production between operators in a common pool. The Steckel lease is in the midst of many producing wells. There can be no contention that drainage did not occur from the other leases. Certainly a production of twenty-six thousand barrels of excess oil from the Steckel lease was grossly inequitable to the other producers. But appellee says he should not be charged with the overage because he was not negligent, had no knowledge of the overproduction, and received no part of the returns. However free from culpability he may have been and however unfortunate his own loss, the important fact cannot be ignored that the excess oil was unlawfully produced and marketed from his lease by his employee placed in charge of production. Certainly the other operators cannot be held responsible for the operation of his lease. Their employees did not produce or steal or market this twenty-six thousand barrels.

The commission has a limited jurisdiction. It possesses no powers not given it by the statute. The law and the regulations clearly contemplate that the wells and leases shall be held responsible for producing only the amounts fixed by the production orders. Any other construction would not only require the exercise of broad judicial powers by the commission but would impose upon it an administrative task so difficult as to imperil the whole conservation and proration program. Certainly the commission had no power to allocate the overage on any theory of relative degrees of negligence of the operators of the Steckel and other leases in the pool. Could it have computed the drainage that had taken place from the various leases? Even if such an allocation would be lawful it would be highly speculative and impracticable. Appellee says in his brief:

"In producing a lease there is a reduction in the common source of supply, but to what extent that might be, no one has been able to determine. We frankly state that we have been unable to find any judicial opinion in which it has been found that there would be any possible basis upon which there could be a determination of damage by reason of drainage. In other words, no court has been able to establish a fixed measure of damage by reason of drainage."

More than that, if the commission would depart from the law and relieve a lease from its overproduction simply because the

responsible operator did not know what was going on or because he did not personally profit from the overproduction, it would assuredly open the gate to fraud and collusion.

We were advised by counsel, in oral argument, that the commission had not resorted in this case to the drastic step of shutting in entirely the Steckel lease, but was proposing to permit the wells to be operated on heavily reduced allowables until the overage was wiped out. At the time of the hearing the Bennett wells had a monthly allowable of 6,047 barrels.

We find no case directly in point, on the facts. However, some underlying principles are well established. First, in the absence of arbitrary or capricious action or abuse of discretion by executive or administrative officers, courts do not interfere with the performance of their acts which are discretionary in character or involve the exercise of judgment. (43 Am. Jur. 72.) Furthermore, the acts of such administrative officers or boards, within the line of their official duties, are presumed to have been regularly, properly, and legally taken. (*State Corporation Commission of Kansas v. Wall,* 113 F. 2d 877 and cases cited, p. 880.)

The right of the state in the exercise of its police powers to protect the correlative rights of producers from a common pool is well established. (*Champlin Rfg. Co. v. Commission,* 286 U. S. 210, 76 L. Ed. 1062; 86 A. L. R. 403; *State, ex rel., v. Bond,* 172 Okla. 415, 45 P. 2d 712; *H. F. Wilcox Oil & Gas Co. v. Bond,* 173 Okla. 348, 48 P. 2d 820; *Bay Petroleum Corporation v. Corporation Commission,* 36 F. Supp. 66.) The right to equalize production, as against overages, was upheld in *State Corporation Commission of Kansas v. Wall.* Its duty to do so was clear.

It follows from what has been said that the lower court erred in setting aside the commission's orders. This conclusion makes it unnecessary to consider other contentions of the appellant.

The judgment is reversed.

PARKER, J. (dissenting): I agree with the majority opinion so far as it holds the state in the exercise of its police power has the right to protect the correlative rights of the producers from a common pool and that the State Corporation Commission has power under the proration statute to equalize production as against overages. I cannot, however, approve the contention advanced by the commission and the rule laid down in the majority opinion approv-

ing it to the effect that oil produced from a lease, irrespective of how or in what manner it is produced, in excess of the allowables fixed for wells located thereon is, in all cases, properly chargeable as an overage against the lease from which it was so produced. My views will be stated as briefly as possible.

Because a statute is constitutional—and I concede the oil proration statute is—it does not follow that all orders made under it are valid. A statute may be absolutely unassailable on constitutional questions and yet a board or commission charged with the duty of enforcing its provisions may so interpret its force and effect and apply it to a particular situation as to deprive an individual of rights guaranteed to him by the constitution. The commission's authority is limited by the language of the statute under which it derives its power and if it attempts to proceed beyond the scope of that grant the court should refuse to sustain its action. My interpretation of the statute in question (G. S. 1941 Supp. 55-603) is, insofar as it pertains to the correlative rights of producers, that if *a person* having the lawful right under a lease to drill into and produce oil from a lease *takes* or *produces* more than his allowable proportion of crude oil, then, and in such event the commission is required and permitted to take steps which will regulate the taking of such crude oil by such person in such manner as to prevent the *inequitable* or unfair *taking* of crude oil by him and equalize the amount so wrongfully taken by him from the common pool in violation of the correlative rights of others having equal interest therein. It seems to me that any interpretation which results in prohibiting an individual from producing oil from his lease simply because more than the allowable has been produced therefrom regardless of the condition under which it was produced—and, to be specific under conditions which were totally unknown to him, and beyond his control, and by reason of which he received no profit and in fact sustained a total loss—results in an unconstitutional application of the statute in that it deprives him of his property without that due process of law guaranteed to him by section 18 of the bill of rights of the constitution of Kansas and the 14th amendment to the constitution of the United States.

We are primarily concerned with the situation in the instant case. What does the record disclose? That from the lease owned by defendant, Bennett, there was taken and produced from a well located thereon 26,005 barrels of oil in excess of the allowables fixed by the

commission. Up to that point in the proceeding the burden of proof was on the commission. I am perfectly willing to concede that if it had stopped there the burden would have shifted and the owner of the lease compelled to assume the obligation of establishing by proper evidence that such overage was not produced and taken from the lease with his knowledge and consent and at his direction. But the commission was not satisfied to follow this procedure. It entered into the stipulation, copied verbatim on page one of the majority opinion, whereby it agreed not only the amounts of overage exceeded 26,000 barrels of oil but also that the oil taken from said lease was stolen, it was produced and it was taken without the knowledge of the owner thereof, and he received no part of the returns from the sale of such oil. At this point let me say in fairness that the stipulation may be open to the construction that it applies only to the overage in barrels and not to the matters hereinabove specifically referred to. However, I do not construe it as limited to the amount of overage and the district court did not do so. Certain also, it is from an examination of the transcript of evidence furnished to the court, that the commission itself considered it as admitting all such matters and things. In fact, this language is found in the commission's brief, "The commission still takes the position that under the *admitted facts* of this case the statute makes it mandatory upon the commission to charge this overproduction against the Steckel Lease and its order should be affirmed." (Italics supplied.) It should also be noted a fair analysis of the stipulation discloses that the overage was produced, taken, and stolen from the lease, not that it was reduced to possession, placed in tanks belonging to the owner and then stolen from him. An examination of the record fails to disclose any testimony the overage was reduced to the actual possession of Bennett. So far as the record goes such overage could have been produced and run into vehicles used by the thieves in conveying it to market. If so, the thieves were not only producing and taking it, but stealing oil from the pool in which the owners of oil leases in the pool had a common interest.

In Kansas there is no property in oil and gas because of their migratory nature, until they have been captured, though each owner may take without limit, unless lawfully restrained. (*Phillips v. Oil Co.,* 76 Kan. 783, 92 Pac. 1119, *Supply Co. v. McLeod,* 116 Kan. 477, 227 Pac. 350; *Gas Co. v. Neosho County,* 75 Kan. 335, 89 Pac. 750; *Zinc Co. v. Freeman,* 68 Kan. 691, 75 Pac. 995; *Burden v. Gypsy*

*Oil Co.*, 141 Kan. 147, 40 P. 2d 463, and *Marrs v. Oxford*, 32 F. 2d 134, 67 A. L. R. 1336, 1345.)

Until discovered and brought to surface no severance of title occurs, the minerals not only remain a constituent part of the land but they belong to the owner of the surface soil beneath which they lie. The lessee has no "right or title to them." (*Zinc Co. v. Freeman*, supra; *Gas Co. v. Neosho County*, supra, and *Burden v. Gypsy Oil Co.*, supra.)

The interest conveyed by an oil and gas lease is not a present vested interest in the oil and gas in place but a mere license to explore—an incorporeal hereditament—a profit a prendre (*Phillips v. Oil Co.*, supra, and *National Supply Co. v. McLeod*, supra).

To a certain extent it can be said the property right of an owner or lessee of land in and to the oil and gas beneath the surface is not an absolute one and such substances because of their peculiarity in the natural state partake more of the nature of "common property" title to which becomes absolute only when they are captured and reduced to possession. Until so produced such rights as are vested by oil leases to oil in a common pool can be said to belong jointly to the owners of such leases (*State Corporation Commission of Kansas v. Wall*, 113 F. 2d 877).

Summarizing, I am convinced that in holding the proration statute requires the charging of overage, irrespective as to how and in what manner it is produced, to the lease from which it is produced, the commission has proceeded beyond the scope of the grant fairly included by the language to be found in G. S. 1941 Supp. 55-603, 55-604. By its action it penalized an individual who had not produced oil in excess of his allowables and did not prevent the inequitable and unfair taking of oil from the pool by that person. Instead of preventing unreasonable discrimination under the facts presented by the stipulation and the evidence its action had the effect of producing it by requiring Bennett to make good for all overage when that overage having been produced and taken from the pool by a third party was properly chargeable, if at all, to the persons having a common interest in the oil in place. In any event, I am convinced a construction of the statute as contended for by the commission under the facts and circumstances of this case would result in such unreasonable, arbitrary and discriminatory action with respect to Bennett, the owner of the lease, as to deprive him of rights guaranteed to him under the constitutional provisions herein referred to

and prohibit the overage disclosed from being charged to the Steckel lease.

I am not unmindful of the fact the rule contended for in this dissent would impose a more difficult task upon the commission in its administration of the provisions of a proration statute. I cannot feel that is an argument which justifies the commission's position. In these times when government, through the medium of rules and regulations of Boards and Commissions, is becoming all too prevalent, too many governmental agencies are prone to deprive the individual of rights guaranteed to him by the constitution under the guise of necessity for effective administration. If we are to be governed in part by rules and regulations, under direction of boards and commissions, government should provide ways and means of efficient administration and at the same time preserve the rights of the individual as guaranteed by the constitution.

Nor do I believe that the wrongful acts of the pumper who was employed by the lease owner, who was proceeding in absolute violation of the duty he owed him, in fact actuated by a purpose to injure him, and acting without the scope of his employment, should be permitted to fix liability on his employer for the overage produced in excess of the allowable. Under the facts and circumstances of this case, I can find no decisions holding that the relationship of employer and employee, principal and agent or master and servant has that legal effect.

SMITH, J., concurs in this dissenting opinion.