No. 47,420

W. L. HARTMAN, *Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS; DALE E. SAFFLES, Chairman, and JULES V. DOTY and VERNON A. STROBERG, Commissioners, *Appellees*.

(529 P. 2d 134)

Opinion filed December 7, 1974.

*William F. Schell,* of Martin, Pringle, Schell and Fair, of Wichita, argued the cause, and *Robert Martin, Paul B. Swartz,* and *J. Taylor Neuschwander,* of the same firm, were with him on the brief for the appellant.

*Jack Glaves,* special counsel, argued the cause, and *James E. Wells,* general counsel, was with him on the brief for the appellees.

The opinion of the court was delivered by

HARMAN, C.: The state corporation commission promulgated a regulation requiring certain information and samples obtained in drilling oil and gas wells to be filed with the state geological sur-

vey. Certain exceptions were provided. Applicant W. L. Hartman's request for exception from the provisions of the regulation was denied by the commission. Upon review the district court of Finney county upheld the commission's denial order and the matter is now here on applicant's appeal.

Following publication of notice and after holding hearings in which several oil producers, drillers and royalty owners or their representatives appeared, the corporation commission on August 19, 1971, promulgated a new regulation designated as rule 82-2-125, which became effective January 1, 1972. Applicant Hartman was present at the hearing and protested adoption of the regulation. KAR 82-2-125 provides:

*"Preservation of well samples and logs.* Every person, firm, association, or corporation drilling or responsible for drilling holes for the purpose of discovery or production of oil or gas (excluding seismic 'shotholes' and 'coreholes') shall preserve and have delivered at his expense (prepaid), the following samples and information to the Kansas geological survey, 4150 Monroe street, Wichita, Kansas, 67209.

"(A) Formation samples (drill cuttings) normally saved in drilling operations shall be retained by the operator; and upon request of the Kansas geological survey, such samples shall be washed, cut into splits (sets) and one set placed in sample envelopes ready for repository when delivered to the above address. Notification to the operator that samples are required shall be made either by notice appended to or on a copy of the notice of intention to drill returned to the operator by the conservation division of the Kansas corporation commission. Delivery of the processed samples shall be made within 90 days of the completion of drilling operations. The survey may, on some bore holes, request shallow samples from portions of the hole that may not normally be saved in drilling operations. In this event, the saving, processing and delivery of such additionally requested samples shall be a voluntary act on the part of the operator. The repository (sample library) shall accept all washed and cut samples whether or not requested.

"(B) A copy of electric logs, radioactivity logs, and similar wireline logs or surveys run by the operator on all boreholes (excluding seismic, 'coreholes,' and logs run for the purpose of obtaining geo-physical data) shall be delivered to the above address within 90 days following the running of such logs or surveys.

"(C) Copies of driller's logs prepared on a form prescribed by the Kansas corporation commission shall be completed and filed with the Kansas geological survey within 90 days after completion of the well.

"(D) Upon receipt of a written request at the address listed herein, said request to be submitted either prior to or simultaneously with, any or all samples or information filed as required in items (A), (B) and (C) hereof shall be held in confidential custody by the survey for an initial period of one year from the date of receipt thereof, unless release of said samples or information is approved in writing prior to the expiration of the one year period: *Provided,*

*however,* The period of confidential custody may be extended for one additional year by written notice to the survey, such notice to be received at least 30 days prior to the expiration of the initial one year period.

"(E) In a like manner, samples, logs or surveys of wells completed prior to the effective date of this order may be submitted to the survey and will be maintained in confidential custody if requested in writing to do so.

"(F) It shall be the duty of each company performing logging services within the state of Kansas to furnish each month, to the state geological survey at the address listed herein, a list of all holes logged.

"Exceptions to the provisions of this rule may be granted whenever the commission shall find that the granting of such exception is justified because of one of the following:

"(1) Compliance with this order will create an economic hardship.

"(2) Submitting the requested samples, logs and information is not necessary for a local or prescribed area.

"(3) The length of the period of confidential custody is not sufficient to satisfy the needs of the developing operator.

"Exceptions may be requested by affidavit setting forth supporting facts. In the event the requested exception is not fully supported, the commission may set the matter for hearing after giving notice thereof."

Applicant Hartman is an independent oil and gas operator with extensive lease holdings in the Damme field in Finney county, Kansas. In 1951 he discovered the Damme pool and has since drilled approximately fifty oil and gas wells in or near that area. Geological information is collected in connection with each well drilled. Electric logs are kept and seismographs are also utilized on the wells. The information acquired is helpful in determining what land to lease and where to drill. Upon occasion applicant had in the past entered into dry hole support agreements whereby in exchange for formation samples, electric log, drilling times and other information supplied by him to other operators holding leases in the field, the latter contribute money toward the drilling of a well (or acreage), to the mutual benefit of the parties.

On January 19, 1972, Hartman filed an application seeking exception from the provisions of rule 82-2-125. He alleged he was the owner of leases covering twenty-one tracts aggregating about 4,600 acres in the Damme pool and he sought exemption from the rule of all of his acreage "and/or the Damme Pool generally". The application alleged the information required to be filed had substantial economic value and public disclosure would create an economic burden in that no dry hole support contributions would be available; further that the two year maximum period of confidentiality was insufficient in that the pool was still being developed and in any event the arrangements of the state geological survey

for safeguarding the filed information were inadequate. Applicant also alleged compliance with the rule would result in confiscation of his property.

Hearing on Hartman's application was had before the corporation commission March 23, 1972. Four major oil producers also appeared at the hearing in opposition to the application. Applicant's evidence consisted of exhibits and the testimony of Robert L. Schmidlapp, his geologist, engineer and production manager. Schmidlapp testified he had supervised the drilling of each of Hartman's wells in the Damme field; the information collected during drilling is important to the leasing of acreage and to the drilling and completion of other wells; the average cost per well over the years spent by applicant in the running of electric logs had been $2,500 but is now around $3,400; applicant has thus spent about $125,000 for the fifty wells drilled by him in the field; he has spent about $200,000 in seismographs; he received contributions toward drilling expense in exchange for electric log information in the discovery well drilled in 1951 and from two others drilled in 1953; applicant has declined on occasions to enter into this type of arrangement because he did not want to disclose the information obtained in drilling; he has undeveloped acreage and leases adjacent to the present boundaries of the pool; other operators have leases around the perimeter of the pool; there is competition when these leases expire; the geological information obtained in drilling applicant's fifty wells is of benefit to the general area and has been used by applicant in acquiring new leases; all types of information secured from drilling are used to evaluate seismograph data; the information obtained by applicant in drilling was paid for by him, it belongs to him, he expects to use it and does not want to give it to competitors in the area; to do so would be an economic disadvantage; applicant is not drilling any wells at the present time but has drilled and completed two wells since the rule was adopted; no samples or logs from these two have been filed; the cost of filing is nominal; three presently contemplated locations remain to be drilled; applicant has drilled more wells in the Damme pool than any other operator. The witness also testified that in his opinion the two year period of confidentiality was not long enough to protect applicant's interest; he had examined the storage facilities of the state geological survey and did not believe they were adequate. He feared applicant's competitors might obtain the information.

This same witness had also testified for applicant in opposition to the rule at the hearing held on its adoption.

The state geologist, Dr. William W. Hambleton, who is also director of the state geological survey, testified. Preliminarily, he stated rule 82-2-125 had been adopted after extensive hearings in order that significant and important information would not be lost; after considering all the testimony presented the rule adopted was an expression of the corporation commission's sensitivity to the testimony of all interested parties and an excellent compromise which satisfied the state's need for information and yet did not unduly add to the cost of doing business. More stringent rules have been established in other states where there is less confidence in the petroleum industry. Absence of adequate rules and regulations elsewhere, coupled with wilful practices, have caused agencies of the federal government to become interested in environmental protection as related to the petroleum industry. Some congressional action has already been taken, which if completed, would probably result in more stringent measures than required by the rule under consideration. In carrying out the provisions of the rule the state geological survey has been careful not to request unneeded samples and information and has developed procedures adequate to safeguard the confidentiality of the information. A burglar and fire resistant file has been requisitioned for such purpose. The witness further testified granting Hartman's application under the circumstances would set a precedent which would emasculate the rules since his leases are little different from leases held elsewhere in the state; anyone who drills a well to extract minerals not only gains mineral resources and information, he also produces a hole which under certain circumstances can be detrimental to the public health and safety; blowouts related to the oil and gas industry have occurred in recent years in Kansas; information from holes in the particular areas was inadequate to determine the source of the problems or the solutions; at least seven major surface collapses have occurred which resulted from corrosion of casing caused by underlying salt solutions; where information is inadequate new holes have to be drilled in the area to secure adequate knowledge; such information is necessary for the protection of fresh water resources and for correction of and protection from blowouts and surface collapses; electric logs are used with other geological data to acquire knowledge of rock pathology and changes in fluids, which is essential in the study of blowouts.

Robert Dilts, manager of the Wichita well sample library of the state geological survey, testified requests for samples are generally limited to "wildcats" (wells drilled one mile or more away from production), wells drilled deeper than those nearby, wells that are one-half mile away from those from which samples are presently held, and wells wherein the survey has a special interest; logs are requested from each well; information in an area such as the Damme field where so many holes have been drilled is necessary; the survey is interested in the setting of surface pipe in the area to protect fresh water strata; electric logs would reveal information as to areas above the producing formation.

Other oil operators made statements at the hearing. Champlin Petroleum Company, which owns producing wells and has interests in about 3,200 acres of land in the area, stated that in the past in order to encourage cooperative testing by drilling, it had contributed acreage to applicant, reserving a minimum overriding royalty thereon. Its position was that for rule 82-2-125 to be of fruitful effect, it must be universally applied and the exception should be denied.

Mobil Oil Corporation objected to the granting of the application, its position being that its grant would be a serious deterrent to further drilling and development in the area. Mobil believed it will not be able to secure approval for drilling proposals unless and until the rule is complied with.

The position of Texaco, Inc., as the applicant is no different from anyone else in the Damme field and doesn't deserve the exception and granting it for the whole Damme pool would set a very bad precedent.

Cities Service Oil Company also opposed the granting of the application; to grant it would do away with the effectiveness of the rule. Cities also stated applicant's evidence was insufficient to bring him within any of the three exceptions to the rule.

In an order filed May 31, 1972, the corporation commission denied the application. After reviewing the evidence and making certain findings the order of denial contained these recitals:

"6. The Commission finds on the basis of evidence presented that the granting of the application for an exception is not justified under any of the three grounds for exceptions set out in Rule 82-2-125 (F). The Commission finds that the evidence presented by the Applicant relating to economic hardship, is based on their apprehension of the possibility of unauthorized disclosure of the information filed and is speculative and conjectural in nature. It is noted by the Commission that evidence presented by the Applicant as to

the quantity and value of geological data accumulated from the Damme Pool relates almost entirely to data which is not required to be filed with the Kansas Geological Survey as it was obtained before the effective date of Rule 82-2-125.

"7. The Commission finds that the Kansas Geological Survey has taken adequate and reasonable security precautions and has adopted reasonable procedures to protect geological data filed or to be filed with the Survey.

"8. The Commission, having considered the history, present stage of development and other factors and characteristics relating to the Damme Pool, finds that the two year confidential period provided under Rule 82-2-125 (D) is adequate and reasonable to protect operators in the said Pool.

"9. The Commission finds that the granting of the application for an exception would damage the effectiveness and purpose of the rule; that the information required to be filed is necessary in order to provide for prudent conservation practices and procedure including the protection of fresh water resources and the health, safety and well-being of Kansas citizens.

"10. The Commission finds that the purpose of providing for exceptions to the provisions of this rule was to provide for specific or special cases involving extraordinary circumstances, and not to allow mass exceptions of substantial portions of or entire pools from the rule."

Thereafter the corporation commission denied an amended application for rehearing filed by applicant. Hartman then petitioned the district court of Finney county for review of the order. That court adopted the corporation commission's findings of fact and conclusions of law but withheld judgment by reason of two further issues raised by the parties in that court: Applicant's contention that the commission exceeded its statutory power in promulgation of the rule in question and the commission's contention that applicant could not collaterally attack the rule in his petition for judicial review. After receiving additional briefs on these two issues the trial court denied relief, holding that the commission's order of denial was not arbitrary, capricious or unlawful; it further held the rule in question was subject to attack by applicant upon his petition for judicial review but that the corporation commission did not exceed its statutory authority in promulgating the rule. The court noted the legislature had empowered the commission to promulgate rules for the exploration, drilling, production and conservation of oil and natural gas and that K. S. A. Chapter 55 sets out guidelines for such rules in the protection of the public interest, including the following:

Prevention of economic, underground and surface waste; protection of correlative rights; disposal of salt water; issuing of drilling permits; re-pressuring— by the injection of air, gas, water and other fluids; plugging of wells; and protection of fresh water.

Applicant Hartman now appeals.

We should first consider the corporation commission's renewed assertion that appellant Hartman may not now collaterally attack the validity of the rule. This contention is premised upon the fact appellant was present and participated in the hearing held by the commission to determine whether the rule should be adopted, appellant objected to its adoption but did not appeal from the order of promulgation. A number of oil producers appeared in opposition at the hearing but apparently none sought district court review of the order. Appellee's argument is that appellant may not now challenge the rule's validity, that matter has become *res judicata*, and appellee includes for good measure appellant is now estopped by laches and by the doctrine of election of remedies to assert his present position. In these latter two contentions appellee seeks refuge in broad general statements of law not applicable here and which need not be further discussed. Essentially appellee says appellant should not have a second opportunity to contest the rule. The proceeding was not an adversary one in the judicial sense and the doctrine of *res judicata*, in any of its aspects, does not bar appellant.

In 2 Davis, Administrative Law § 18.08, it is stated:

"In name and tradition 'res judicata' means thing adjudicated. Only what is adjudicated can be res judicata. Administrative action other than adjudication cannot be res judicata. Even if an exercise of the rule-making powers depends on a finding of facts, neither the rule nor the finding is regarded as res judicata." (p. 597.)

We have held the doctrine of *res judicata* does not ordinarily apply to the decisions of administrative tribunals (*Warburton v. Warkentin*, 185 Kan. 468, 345 P. 2d 992) and in *Aylward Production Corp. v. Corporation Commission*, 162 Kan. 428, 176 P. 2d 861, a proceeding in which the target was a commission order establishing a minimum allowable for oil for wells in prorated pools, this court said:

"Force is given this argument by the fact that rules and regulations of the commission are never *res judicata*. Should bad consequences follow from such an order being made the commission might change it to meet conditions as they exist." (p. 440.)

The rule appears clearly to be that regulations made by an administrative agency are not *res judicata*.

Appellant contends the appellee commission had no statutory authority to promulgate rule 82-2-125 and its act in doing so was an

arbitrary and capricious exercise of power. He argues the regulation does not carry out any statutory objective. He asserts, and correctly so, that to be valid, administrative regulations must be within the authority conferred, and further that an administrative regulation which goes beyond or conflicts with legislative authorization is void, citing *Amoco Production Co. v. Armold, Director of Taxation,* 213 Kan. 636, 518 P. 2d 453. He argues our statutes give appellee only the authority to prevent waste in the *current production* of oil and gas and the rule in question has no reasonable relation to that end—its only purpose is to try to secure information helpful in knowing where to explore for *future* oil and gas wells. He points out that legislatures in many other oil producing states have expressly conferred upon their regulatory agencies authority to require the furnishing by drillers of the material encompassed here by the rule in question and argues this tends to show that without specific enabling authority a commission empowered only to prevent "waste" is not authorized to speculate on future discovery by requiring the filing of electric logs.

In 1 Summers, Oil and Gas, § 82, it is stated:

"There is a considerable variance in the extent of the control which the different oil and gas producing states exercise over the location, drilling, equipping and operating of oil and gas wells for the prevention of waste and the protection of correlative rights. . . . [pp. 269-270]

. . . . . . . . . . . . .

"Statutes or regulations commonly require that the operator keep at each well, while drilling, an accurate drilling record or log, showing all formations drilled through, method of casing, and other detailed information that may be required, and upon completion or abandonment of the well, require that copies of such record be filed with the conservation agency or other state or county officer." (pp. 274-275.)

Let us examine our own statutes pertaining to the corporation commission's powers and duties. K. S. A. 1973 Supp. 55-128 provides that anyone responsible for drilling seismic, core or exploratory holes for the purpose of exploration, discovery or production of oil and gas shall first give prior notice to the state corporation commission of intent to drill, such notice to include certain information pertaining to the proposed drilling; further that:

"The corporation commission shall determine the amount of pipe necessary to protect all usable water, and shall so notify the person, firm, association or corporation submitting the notice of intent to drill before said drilling is commenced.

. . . . . . . . . . . . .

"No person, firm, association, or corporation shall set pipe at any seismic, core or exploratory hole except with the approval of the state corporation com-

mission and in conformance with the rules and regulations of the corporation commission, except that additional pipe beyond the requirements of the corporation commission may be set by the driller. Before any such hole is abandoned, it shall be the duty of the party responsible for drilling such hole to plug the same in such manner as to properly protect all water-bearing formations and in conformance with the rules and regulations adopted by the corporation commission;

. . . . . . . . . . . . . .

"It shall be the duty of the owner or operator of any well which is now drilling or drilled or that may hereafter be drilled for the purpose of discovery of oil and gas, before abandoning same, to shut off and exclude all water from entering oil-bearing or gas-bearing sand, strata or formation encountered in the well and to use every effort and endeavor to protect any usable underground or surface water from infiltration or addition of any detrimental substances, in accordance with methods, rules and regulations of the state corporation commission and under its direction. Before any work is commenced to abandon any well, the owner or operator thereof shall give written notice to the state corporation commission or the agent of the commission as hereinafter designated, of his intention to abandon such well; the date upon which the work of abandonment shall begin, and that he will plug the well in accordance with the rules and regulations as prescribed by the commission. . . .

"Whenever operations shall cease for a period of ninety (90) days on any well which is now drilled, is being drilled or may hereafter be drilled in the future for the purpose of exploration, discovery or production of oil, gas or other minerals, the owner or operator of such well shall give notice thereof to the commission and, if the commission shall deem it necessary to prevent the pollution of any fresh water strata or supply, shall cause such well to be temporarily plugged in accordance with the rules and regulations of the commission and under its direction. . . .

"The state corporation commission is hereby authorized and directed to adopt rules and regulations necessary to carry out the provisions of this section. Prior to adopting any such rules and regulations, the commission shall take into consideration any recommendations of the state board of health, state geological survey and state water resources board with respect thereto. . . ."

K. S. A. 55-130 directs the commission to adopt such reasonable rules as may be necessary to provide the methods by which oil and gas wells or holes may be plugged or abandoned. K. S. A. 55-601 prohibits and declares unlawful the production of crude oil or petroleum in such manner and under such conditions as to constitute waste. K. S. A. 55-602 provides:

"That the term 'waste' as used herein, in addition to its ordinary meaning, shall include economic waste, underground waste, surface waste, waste of reservoir energy, and the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands. The state corporation commission shall have authority to make rules and regulations for the prevention of such waste and for the protection of all fresh-water strata, and

oil- and gas-bearing strata encountered in any well drilled for, or producing, oil. . . ."

K. S. A. 1973 Supp. 55-604 provides:

"(A) The commission shall have and is hereby given jurisdiction and authority over all matters involving the application and enforcement of the act [act regulating production of petroleum oil, etc.], and shall have authority to make and enforce rules, regulations and orders for the prevention of waste as herein defined and for carrying out and enforcing each and all of the provisions of this act. . . ."

K. S. A. 55-704, relating to the production and conservation of natural gas, states:

"The commission shall promulgate such rules and regulations as may be necessary for the prevention of waste as defined by this act, the protection of all water, oil or gas-bearing strata encountered in any well drilled in such common source of supply . . . as the commission may find necessary and proper to carry out the spirit and the purpose of this act. . . ."

The foregoing statutes provide broad authority and direction to the corporation commission to prevent waste, including economic waste, in the production of oil and gas, to conserve these natural resources and to protect usable water as it may be affected by drilling for oil and gas. It has specific duties with respect to drilling, placement of pipe and abandonment and plugging of wells. To discharge all these responsibilities effectively the legislature must have been aware the commission would need certain information as to the holes drilled. Rule-making power was given the commission in carrying out its functions. Appellee asserts rule 82-2-125 was adopted to help prevent loss of ultimate recovery of this state's oil and gas reserves. Historically, powers granted to regulatory bodies under conservation statutes have been liberally construed by the courts. In *Aylward Production Corp.* the corporation commission took a restricted view of its own rule-making power with respect to fixing minimum allowables. In broadening the commission's narrow interpretation this court conceded that looking at the provisions of only one statute the commission's construction would be proper, then observed:

"But these provisions must be construed in connection with the whole purpose of the act and with the broad provisions with reference to the commission's power, all of which have been heretofore set out." (p. 441.)

In *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 222 P. 2d 704, the court was concerned with the corporation commission's authority to fix a minimum wellhead price for natural gas. These observations were made:

"The dominant purpose of this statute [55-704] is to prohibit waste of natural gas in Kansas, not only in the manner and under the conditions of its production, but for such purposes as would constitute waste. In order that the term 'waste' should not be narrowly construed the statute makes it clear that it is to include economic, underground and surface waste, and the term 'economic waste' is defined. These provisions were for the purpose, if necessary, of expanding the meaning of the term 'waste' and not for the purpose of limiting such meaning. The statute also deals with the rights of owners of property under which there is a common source of supply of natural gas. We think the statute is broad enough to authorize the commission to make any rule or order to prohibit waste of natural gas, upon proper application made to it. . . . It is true the statute did not specifically authorize the commission to fix a wellhead minimum price to be paid for gas produced. It did not forbid the commission to do so if and when the evidence disclosed the fixing of such price would tend to prevent waste and the inequitable and unfair taking of gas from a common source of supply. Hence, the legal question presented by appellants, that the statute did not authorize the commission to make the interim order complained of, is not well taken." (p. 732.)

The court further held:

"In this state the production and distribution of natural gas for light, fuel and power is a business of a public nature, the control of which belongs to the state.

"The dominant purpose of our statutes pertaining to the production and conservation of natural gas [55-701, *et seq.*] is to prohibit waste of natural gas in Kansas, not only in the manner and under the conditions of its production, but for such purposes as would constitute waste." (Syl. ¶¶ 2 & 3.)

Appellant also contends the information required by the regulation bears no reasonable relation to the prevention of waste. We are aware of no case in any jurisdiction having either a rule or statute similar to 82-2-125 where such a challenge has been made. The evidence here on this point is somewhat vague due to the fact appellant raised the point collaterally before the district court on the hearing of its petition for review. The hearing before the corporation commission was to determine whether appellant should be granted an exception to the regulation. However, the record before us reveals that when the regulation was adopted the commission made the following findings:

"3. The evidence presented supporting the adoption of the proposed rule consisted of four (4) witnesses including members of the Kansas Geological Survey, the President and past President of the Kansas Geological Society, and Geologists active in the oil and gas industry. The substance of their testimony and evidence presented was that the present voluntary system, which relies on voluntary contributions of samples and logs to the survey, is no longer adequate as evidenced by the marked decline in their receipt of such data in recent years. Additional testimony indicated that much informa-

tion vital to future exploration for oil and gas in Kansas had been irretrievably lost.

"4. Additional evidence indicated that for the period from July 5, 1970, to December 31, 1970, samples were received from 44% of the wells drilled in that period and that the receipt of samples from wildcat wells also showed a substantial decline. The evidence indicated that the conservation of well samples and log information and *the continued loss of such information could result in economic and physical waste.*" ( Our emphasis. )

Appellee asserts that without reliable geological data such as that revealed by electric logs its conservation division cannot develop the expertise to require proper use of reservoir energy and achieve maximum recovery in the reserves; further that availability of logs can prevent unnecessary drilling. Upon the hearing of apellant's application for exception there was evidence blowouts can affect fresh water, that electric logs provide information relative to blowouts and that the information called for is also necessary for the design of appropriate practices in the interest of public health and safety.

We need not labor the matter. The legislature has authorized the commission to adopt regulations for the prevention of waste and for the protection of all fresh water strata and oil and gas-bearing strata encountered in any well drilled for oil. We think the power to enact the rule in question is necessarily implied within those broad grants and the information required by the rule is reasonably related to the prevention of waste in the production of oil and gas and to the protection of usable water as it may be affected by such production.

Appellant further contends his application for an exception to compliance with 82-2-125 was improperly denied because the findings upon which the denial order was based are unreasonable, arbitrary, capricious and not supported by substantial evidence. He says he should have had an exception under subsection 1 of the rule ( economic hardship ) and 3 ( insufficient period of confidential custody ) because he produced evidence of past sales of the information now required to be furnished by the rule and also his expert believed the two year period of confidentiality was insufficient due to appellant's unique position in the Damme field by reason of the large number of wells he already had with his mass of information on them, plus his undeveloped acreage.

It should be noted appellant was not seeking exception for one particular well nor one limited area—rather he sought exemption for all his acreage in the Damme pool and/or the Damme pool

generally. Appellant's evidence respecting economic hardship did show that when the field was new he had received contributions under dry hole agreements and that he had a valuable mass of information accumulated from his drilling the fifty wells in the pool, which he says he would have to disgorge without recompense. But all this occurred prior to the adoption of the rule. Section (E) of the rule states that sample logs or surveys of wells completed prior to the effective date of the rule *may* be submitted to the survey for confidential custody. Such submission is not required but is wholly voluntary. Thus the material upon which appellant largely bases his contention of economic hardship is not required to be filed.

The burden of proof in bringing himself within the exceptions provided in the rule was, of course, on appellant. The commission specifically found that on the basis of the evidence presented the grant of an exception was not justified. Appellant presented no evidence with respect to problems encountered or likely to occur in any specific well or era. The request was simply for blanket exemption of appellant's entire holdings and/or the entire field. There was no testimony concerning conditions or positions of the two wells completed after the adoption of the rule with relation to acreage owned by others or of the contemplated three locations or as to how they would be affected by the rule. There was no indication dry hole support money was sought and was unavailable. There was no testimony the rule would in fact deter future contributions. Other than the bare assertion of opinion by his expert, appellant made no showing that the one year period of confidentiality or the two year period (actually two years plus ninety days) would not be sufficient "to satisfy the needs of the developing operator". In denying the application the commission was aware the Damme field was then entering its twenty-second year of development. Except for the size of his holdings and number of wells appellant was not shown to be in any position different from others in the field. No evidence was offered respecting any "step-out" or other location proposed for exemption or what would happen under the rule. All the appellant offered must be regarded as merely conjecture. Conceivably he might make a factual case justifying exemption from the rule but he did not do so. The commission's finding that the geological survey had adopted reasonable procedures to safeguard the information filed with it is amply supported by the evidence. In arguing insufficiency of evidence appellant largely ignores that offered by the commission which indi-

cates a need for the information required by the rule. As was said in *Railroad Commission v. Humble Oil & Refining Co.*, 193 S. W. 2d 824, (Tex. Civ. App.):

"The responsibility for the proper administration of the conservation laws rests primarily with the Commission. What factors shall be considered, and their proper evaluation are matters exclusively within the Commission's discretion and not subject to judicial review, so long as they bear a reasonable relation to the subject matter of the order." (p. 833.)

In sum the commission's order of denial was supported by substantial evidence and was not arbitrary or unreasonable.

Finally, appellant contends 82-2-125 and the order of denial entered pursuant to it amount to a taking of property without due process of law in violation of the fourteenth amendment to the federal constitution. Appellant acknowledges that the state may, in the exercise of its police power, legislate to prevent the waste or exploitation of natural resources. On the other hand, he asserts, the means used to secure the legislative ends must not be unreasonable, arbitrary or capricious, and must have a real and substantial relation to the objective sought to be attained. We treat first with the denial order. Appellant says it takes his private property for public use without just compensation. This contention is postulated on the same claim of economic burden which we have already considered and held to be not supported by the evidence offered. Appellant had a fair hearing. He has not shown his position to be any different from others affected by the rule. He has not demonstrated any financial loss nor has he shown how he would be adversely affected in the future by the denial of his application for exemption.

Appellant asserts the substantial cost incident to the acquisition of the information warrants the regulation being declared unconstitutional as a taking of property without just compensation. His testimony was that the average cost of obtaining a portion of the information was currently about $3,400 per well. However, this figure is misleading because it appears that the information is routinely obtained during the drilling of a well as a matter of standard operating procedure. The costs of filing the information were shown to be only nominal. The pecuniary injury of filing would not alone warrant declaring the regulation unconstitutional (see 16 Am. Jur. 2d, Constitutional Law, § 294).

In 16 Am. Jur. 2d, Constitutional Law, § 363, it is stated:

"The constitutionally protected right of property is not an absolute right. The right is subject to such reasonable restraints and regulations established by

law as the legislature, under governing and controlling power vested in it by the constitution, may think necessary and expedient. Thus, it is subject to limitation by reason and by means of legitimate exercises of the state's police power." (pp. 691-692.)

Appellant cites eminent domain cases to support his proposition of unconstitutionality of the regulation. The distinction between the exercise of the right of eminent domain and the police power has been articulated in 29A C. J. S., Eminent Domain, § 6, thus:

"Eminent domain takes property because it is useful to the public, while the police power regulates the use of, or impairs rights in, property to prevent detriment to public interest; in the exercise of eminent domain private property is taken for public use and the owner is compensated, while the police power regulates an owner's use and enjoyment of property, or deprives him of it, by destruction, for the public welfare, without compensation other than the sharing of the resulting general benefits." (p. 178.)

In *Smith v. State Highway Commission,* 185 Kan. 445, 346 P. 2d 259, this court stated:

"The police power is the power of government to act in furtherance of the public good, either through legislation or by the exercise of any other legitimate means, in the promotion of the public health, safety, morals and general welfare, *without incurring liability* for the resulting injury to private individuals. [Citations.] Eminent domain, on the other hand, is the power of the sovereign to take or damage private property for a public purpose *on payment of just compensation.* . . .

". . . Determination of whether damages are compensable under eminent domain or noncompensable under the police power depends on the relative importance of the interests affected. The court must weigh the relative interests of the public and that of the individual, so as to arrive at a just balance in order that government will not be unduly restricted in the proper exercise of its functions for the public good, while at the same time giving due effect to the policy in the eminent domain clause of insuring the individual against an *unreasonable loss* occasioned by the exercise of governmental power." (pp. 453-454.)

Much of that which has already been said is applicable here. The regulation is designed to prevent waste in the production of oil and gas and to protect usable water as it may be affected by such production. Assuming that filing the information could impair the filer's use of it, a period of two years confidentiality is allowed for such use and upon a proper showing of economic hardship or that the period of confidentiality is too short, under the exception in the regulation no filing need be made at all. These are adequate safeguards for the protection of private rights as against those of the

public. Neither 82-2-125 nor the denial order violates the due process clause of the federal constitution.

The judgment is affirmed.

APPROVED BY THE COURT.

FATZER, C. J., dissenting: I respectfully dissent from that part of the holding of the court contained in Syllabus Paragraph No. 4, and the corresponding portions of the opinion that the State Corporation Commission has statutory authority to adopt the rule in question; that the rule is reasonably related to the prevention of waste in the production of oil and gas, and to the protection of usable water as it may be affected by such production; that the applicant failed to sustain his burden in proving an exemption; that the State Corporation Commission's order of denial was supported by substantial evidence and not arbitrary or unreasonable, and that the Commission's rule and denial order did not violate the due process clause of the federal Constitution.

The State Corporation Commission possesses no powers not granted it by statute. (*Bennett v. Corporation Commission,* 157 Kan. 589, 596, 142 P. 2d 810.) Allegedly, under the authority granted by K. S. A. 1973 Supp. 55-604, and K. S. A. 55-704, the Commission promulgated K. A. R. 82-2-125. Rules and regulations of an administrative agency are void when they bear no reasonable relation to the purpose for which they are authorized to be made. I fail to see how the Commission's rule K. A. R. 82-2-125 accomplishes the purposes set forth in the relevant statutes.

SCHROEDER, J., joins in the foregoing dissenting opinion.