No. 47,308

The Farmers State Bank of Ingalls, Kansas, (Plaintiff), Louis D. Conrardy, Duane E. West, et al., (Third Party Plaintiffs), *Appellees*, v. George Meeker, (Third Party Defendant), *Appellant*.

(524 P. 2d 690)

Opinion filed July 17, 1974.

*Lelyn J. Braun*, of Garden City, argued the cause and was on the brief for the appellant.

*Robert F. Glassman*, of Hays, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

Harman, C.: This action commenced as one on a promissory note, brought by the Farmers State Bank of Ingalls, Kansas, against

sixteen defendants who signed the note to raise money in aid of George Meeker in his bid for election to Congress in the 1968 political campaign. At defendants' instance Mr. Meeker was made a third party defendant. Trial to the court resulted in judgment for the bank against the sixteen defendants for the balance due on the note and a further order that these defendants have judgment on their third party petition against Meeker for any amount they are required to pay the plaintiff bank. Mr. Meeker has appealed from the ruling against him. No appeal was taken by the sixteen defendants from the judgment obtained by the bank against them. Upon oral argument we were told they have paid that obligation and the issue now is whether Meeker is liable to them as decreed by the court.

There was some dispute in the evidence at trial and our factual recitation and consideration will be in the aspect most favorable to the sixteen defendants as the prevailing parties in the district court.

To promote the election of George Meeker, the Democratic candidate for Congress in the first congressional district of Kansas, a Meeker for Congress Committee was organized. Frank Anderson was named chairman of the committee. Ed Lewis became treasurer and Don Crane was one of several area chairmen. A Meeker for Congress account was opened with the Farmers State Bank of Ingalls in July, 1968. Mr. Lewis was on the signature card of the account, he deposited campaign contributions in it and upon Mr. Meeker's approval wrote checks to pay campaign bills.

During the latter stages of the campaign prospects for success at the polls appeared good, contributions were coming in but additional money for advertising was needed to offset increased TV promotion by the opposition. Mr. Meeker understood that election laws limited the amount a candidate could personally spend in his campaign. Some time in October and prior to the preparation of the note various discussions were had by Meeker, Anderson and Lewis concerning the possibility of inadequate funds to complete the campaign and meet accrued and prospective expenses, and also the possibility of obtaining a loan at the Ingalls bank for this purpose. The then acting president of the Ingalls bank discussed the matter with one of the three persons—he did not remember which one. In any event the banker prepared a promissory note to the bank in the sum of $25,000 dated November 1, 1968, payable upon demand and bearing seven percent interest. The note was to be taken

to various political rallies to obtain signatures and then returned for the bank's ultimate acceptance or rejection.

Being dissatisfied with the form of the note and desirous that no one signer be obligated for the entire amount, Mr. Meeker took the note to a Dodge City attorney, who rewrote it and added thereto a paragraph stating:

"The liability of each of the makers of this note is limited to the full amount of principal and interest due divided by the total numbers of makers."

In the latter part of October, 1968, Meeker, Anderson and Don Crane were present at campaign headquarters in Dodge City at which time Meeker presented the note to Anderson and Crane to circulate and obtain signatures during the upcoming campaign caravan. Crane protested, saying he had already canvassed his area and no more money could be raised. Meeker assured him, and Anderson as well, the note was merely an instrument for Meeker to obtain campaign funds legally and the signers would not be liable; that contributions were coming in well but if there was any indebtedness remaining on the note he, Meeker, would personally pay the balance and the signers would not be called upon to pay. The goal was 100 signatures.

During the ensuing campaign caravan Anderson and Crane circulated the note on Meeker's instructions and secured the signatures of thirty-nine individuals. They testified that in each instance prospective signers were informed they would not be liable on the note, they would be signing merely to enable Mr. Meeker to borrow money from the bank and if any balance remained due on the note Meeker would take care of it. Not all those solicited signed.

Five defendant signers testified they signed upon Anderson or Crane's assurance there would be no liability on the note as George Meeker would take care of any balance remaining due. It was stipulated the testimony of the other eleven defendants would be the same.

The note was returned to and accepted on December 8, 1968, by the Ingalls bank for the sum of $15,000 which amount was credited to the Meeker for Congress account. Mr. Meeker immediately drew a personal check on the account to the High Plains Advertising Agency, which handled his campaign advertising, for $16,553.26 which liquidated the account.

Later, after discussing the matter with Meeker, the Ingalls banker sent to all note signers notices of payments due in the sum of $350.00

each. Twenty-two signers eventually paid the bank. Several sent word to the bank they understood they were not to have any liability on the note. Meeker sought to have the banker send another request for payment and when the banker declined, did so himself. Anderson and Crane, who had signed the note, each told Meeker they were not going to pay until he paid them. Meeker sent his personal check for $350.00 to Anderson and to Crane, whereupon each paid that amount to the bank. This lawsuit ensued when the remaining sixteen signers did not pay (one did make a partial payment).

Meeker testified. He admitted having the note prepared for use on the caravan by Anderson and Crane to supply campaign funds but denied any attempt to evade campaign laws. He testified he did not authorize Anderson and Crane to tell signers they would not be liable; enough signers were to be secured so that no one would be hurt even if some amount was due on the note; campaign contributions from other sources were coming in well and his statement was that signers of the note *probably* wouldn't be called upon to pay anything. He denied telling Anderson and Crane he would pay any balance remaining due on the note. He paid their part on the note because he felt they should have some reimbursement for campaign expense they had personally incurred. He had hoped sufficient contributions would come in to take care of the note but after his defeat they were not forthcoming.

Meeker also produced evidence that two persons solicited by Crane were not told anything about Meeker picking up the note—they understood the legal implications of the note and refused to sign. Four others testified they were not told they would have no liability on the note—they signed and later paid off.

In rendering its decision the trial court made findings of fact and conclusions of law in a memorandum opinion. After reciting the making of the note opinion continued with the following:

"3. Thirty-nine (39) persons signed the instrument; the sixteen (16) original defendants are persons who signed the note and have not paid their proportionate share of the full amount loaned; and Defendant Harry Nance has been credited with payment of $75.00.

"4. One George Meeker of Garden City was conducting his campaign for the office of United States Representative of the First District in Kansas during the fall of 1968, for which arose a need for additional money to pay accumulated and anticipated debts.

"5. George Meeker took up the matter of loans for his campaign with Lloyd Hutchison, the then manager and chairman of the Board of Directors

of the Farmers State Bank at Ingalls, Kansas. Mr. Hutchison agreed to consider approving a loan up to a maximum amount of $25,000 after signatories were secured on a note to support the loan.

"6. Lloyd Hutchison prepared a note and gave it to George Meeker, who on Sunday, October 27, 1968, took the same to Dale Saffels, a practicing attorney in Garden City, Kansas and asked Dale Saffels to re-draft it and to add an additional third paragraph, which in effect would limit the liability of the signers to equal proportionate amounts of the total that they would borrow.

"7. Prior to the making of the note a Meeker for Congress Committee was set up, among whom were Ed Lewis, who acted as treasurer; Frank Anderson, who acted as campaign chairman, and Don Crane, who acted as an area chairman.

In discussions of the committee's financial problems George W. Meeker informed Frank Anderson and Don Crane that he would have to have election bills paid prior to election day and that he couldn't borrow any money in his own name because it would be contrary to the election laws. Meeker in other discussions informed Frank Anderson and Don Crane that he had made arrangements for a loan with the Farmers State Bank of Ingalls for the sum of $25,000.00. Ed Lewis, Treasurer of the Meeker for Congress Committee, testified that he recalled that George Meeker had stated that he had made arrangements for a loan with the plaintiff bank before the note was prepared.

"8. George Meeker took the note to Dodge City, showed it to Don Crane and Frank Anderson and requested them to take the said note with them on the campaign caravan on October 28, 1968, and get signers on the note so that the $25,000 needed for the remainder of his campaign could be borrowed. George Meeker instructed Don Crane and Frank Anderson that they should tell the signers that this was just a method for him, George Meeker, to borrow money legally, and that they, the signers, would not incur any liability on the instrument as he would take up any remaining obligations if sufficient voluntary contributions did not come in.

"9. Thereafter Don Crane and Frank Anderson together circulated the note while on the caravan and secured the signatures of all the defendants herein, including others who are not parties to this lawsuit; in each instance, Frank Anderson and Don Crane put forth good faith effort to inform the potential signers and those who did sign the instrument that their signing the note was merely a method for George Meeker to borrow money for his campaign; that George Meeker would take up any balance remaining due on the instrument after all contributions came in, and that the signers in no way would be liable. All signers had ample opportunity to examine and read the instrument before signing it. In all instances the witnesses who were signers testified that they relied upon the representations of Don Crane and Frank Anderson relative to their not being held liable on said instrument; that George Meeker would be responsible for any unpaid balance due, and that they were merely signing the instrument to facilitate George Meeker in borrowing money at the bank.

"10. After 39 signatures were secured on the note, Frank Anderson testified that George Meeker agreed to meet him at the bank, so that the note could be returned to the Farmers State Bank at Ingalls and cause the money to be

paid over to Meeker. Anderson took the note to said bank and waited a while for George Meeker to appear; Anderson then left the instrument with an employee at the bank and left and did not return.

"11. After the instrument was returned to the bank, George Meeker completed the loan arrangement with Lloyd Hutchison the Chairman of the Board of Directors of said bank, for the principal sum of $15,000 rather than the original stated sum of $25,000.

"12. The plaintiff bank deposited the sum of $15,000 in The Meeker for Congress Account, with Ed Lewis, Treasurer, as the only one authorized to draw on the account. Ed Lewis testified that he drew on the account to pay obligations only at the direction of George Meeker. The deposit was made on December 8, 1968. The note, Plaintiff's Exhibit 2, was dated November 1, 1968, and was for the original amount of $25,000; when it was returned, a notation at the top of the note indicates that it was to bear interest from December 8, 1968, and the principal amount was shown to be $15,000.

"13. On the 9th day of December, 1968, George Meeker, over his own personal signature, wrote a check drawn on the Farmers State Bank of Ingalls in the amount of $16,553.26, payable to the High Plains Advertising Agency, representing the final campaign expense payments. This check was honored by said bank and debited to The Meeker for Congress account, and in effect closed out the account. George Meeker had no other account, personal or otherwise, in said bank.

"14. All the defendant signers of said note were supporters of George Meeker for Congress, and signed the note with the intent and for the purpose of helping him in his effort to get elected to the office for which he was campaigning.

"15. In reliance upon the signatures appearing on the note, some being the names of persons he knew by general reputation and some by inquiry from other persons, Lloyd Hutchison of the Farmers State Bank of Ingalls, Kansas, made the $15,000 loan, as evidenced by the note here involved.

"16. George Meeker paid to Don Crane and Frank Anderson each the sum of $350, which was the original amount demanded of each signer of the note as their proportionate obligation on the note; Frank Anderson and Don Crane at that time had not paid their proportionate shares; but did apply George Meeker's payment to them toward the demanded obligation on the note.

## "CONCLUSIONS

"1. Frank Anderson and Don Crane were at all times acting for and on behalf of George Meeker and at his direction.

"2. All signers of the note knew the import of what they were signing.

"3. The note is a valid obligation owed in proportionate shares as to the unpaid balance by each of the original defendants, namely, Louis D. Conrardy, William Bleumer, James C. Ford, Paul Wolf, Duane E. West, Norris T. Davis, Joe F. Luecke, Mike Billinger, Neil Fischer, Tony Mermis, Alvin A. Kohl, Wesley Bittel, Ted Munk, Rich Robben, Dale Lyon, Russell Raulston and Harry K. Nance, in the amount of $327.89 each, except as to Harry Nance

whose obligation is $252.89, all with interest at 7% from December 12, 1968, together with costs of this action, sharing equally.

"4. George Meeker arranged with the bank, the plaintiff herein, to make the loan; supervised preparation of the note; directed the securing of accommodation signatures to the note to facilitate the completion of the loan; completed the negotiation for the final loan of $15,000; directed and controlled the pay-out for all expenses incurred by his campaign, and made the final pay-out from the Meeker for Congress account over his personal signature.

"5. Money so borrowed and used by George Meeker was for his personal use and was used by him for his personal obligations.

"6. The evidence clearly establishes that the signing of the note by each of the defendants was for the accommodation of Third-party Defendant George Meeker, and the liability of each of them is that of an accommodation party, and each of them is therefore subrogated to rights the plaintiff bank has, against Third-party Defendant George Meeker, and shall have judgment against said Third-party Defendant, George Meeker, for any and all amounts that they may be required to pay under this judgment, including the principal, interest and costs, when they have paid the same."

Appellant presents his points for reversal under three headings. First he asserts the trial court erred in its finding No. 5 and conclusion No. 14 in that there was no evidence to support a finding that he ever made arrangements with the plaintiff bank for the $15,000 loan. There is no conclusion No. 14 and we assume appellant is really challenging conclusion No. 4 since it parallels and amplifies finding No. 5.

The matter of obtaining a loan at the Ingalls bank was discussed between Meeker and his campaign lieutenants. Meeker admitted it might have been his idea. Although the banker was somewhat vague in his testimony as to who initially contacted him about arranging the note—he thought it was Meeker, Anderson or Lewis as all had been in the bank, and Meeker was similarly vague as to his appearances at the bank—the banker testified positively he discussed the loan with Meeker. Meeker obtained the note, supervised its redrafting, turned it over to Anderson and Crane with directions to secure signatures and once the note was credited he immediately disbursed its proceeds by his personal check honored by the bank. The matter need not be further labored. There was overwhelming evidence, including Meeker's admissions, to support the finding now complained of.

Appellant further contends the trial court's findings of fact Nos. 8, 9, 10 and 11 were not supported by evidence. These findings go to the heart of the lawsuit. Appellees presented one version of events, appellant another. In *Morris v. Hoesch*, 204 Kan. 735, 466 P. 2d 272, the oft-repeated rule is stated:

"Upon appellate review this court accepts as true the evidence, and all inferences to be drawn therefrom, which support or tend to support the findings in the trial court, and disregards any conflicting evidence or other inferences which might be drawn therefrom. Where findings are attacked for insufficiency of evidence, or as being contrary to the evidence, this court's power begins and ends with determining whether there is evidence to support such findings. Where the . . . findings are so supported, they will not be disturbed on appeal. It is of no consequence there may have been contrary evidence adduced which, if believed, . . . would have supported different findings." (Syl. ¶ 3.)

Anderson and Crane testified positively as to their express authority and directions from appellant, which in turn they relayed on to the appellees. There was evidence to the conrtary but the fact finder resolved the dispute in favor of appellees and those findings may not now be disturbed.

Appellant levels a barrage of shots in his final argument for reversal. Most of the authority cited would be pertinent if this were a suit by the bank against appellant rather than between him and appellees. His principal point seems to be that the action is barred by the statute of frauds in that his alleged promise to pay the debt of another was not in writing as required by K. S. A. 33-106. The contention has no merit. In 2 Corbin on Contracts, § 357, it is stated:

"To fall within the statute [of frauds], a promise must be made to a creditor or obligee to whom the third person is then or later becomes under obligation. A promise to a debtor to pay or otherwise answer for his debt or default to a third person is not within the statute."

See also 3 Williston on Contracts, 3d ed., § 478.

Our own precedent is in accord. In *Hines v. Roberts Bros.*, 117 Kan. 589, 232 Pac. 1050, this same rule was quoted approvingly:

" 'A promise to a debtor, for a valuable consideration, to pay his debt to a third person is not a promise to answer for the debt of another person, within the statute of frauds, which applies only to promises made to a creditor; and such a promise made to the debtor need not be in writing.' " (pp. 592-593.)

Appellant's oral promise here was made to the signers of the note, the debtors, rather than to the creditor bank; hence the statute of frauds is not applicable.

Appellant points out the bank never intended the instrument in question to be an accommodation note, yet, he further asserts, the trial court erroneously converted it into that kind of instrument and rendered judgment accordingly. K. S. A. 84-3-401 (1) provides:

"*Signature.* (1) No person is liable on an instrument unless his signature appears thereon . . ."

The official uniform commercial code comment to the foregoing states in part:

"Nothing in this section is intended to prevent any liability arising apart from the instrument itself. The party who does not sign may still be liable on the original obligation for which the instrument was given, or for breach of any agreement to sign, or in tort for misrepresentation, or even on an oral guaranty of payment where the statute of frauds is satisfied."

It is true appellant did not sign the note and the banker testified he made the loan only on the signatures attached to the note and did not look to appellant for its payment. Appellees' obligation to the bank could not in strictness be regarded as accommodation paper insofar as that term is generally understood. Under the circumstances the fact the trial court used the term "accommodation" in its conclusions does not affect the validity of its ultimate holding. It found all the requisite facts upon which to render the judgment it did. Through his authorized agents, appellant in effect promised to assume any liability which might be cast upon appellees if sufficient campaign contributions did not come in to pay the note. He alone had the authority to expend the proceeds thus otained for his benefit, which authority he exercised. The present action is not on the note; it is on an oral agreement underlying the execution of the note. We know of no reason why appellant should not be held accountable on that agreement as ruled by the trial court.

The judgment is affirmed.

APPROVED BY THE COURT.