No. 47,948

DAVID RUSH, *Appellee*, v. KING OIL COMPANY, and T. WARREN HALL, *Appellants*.

(556 P. 2d 431)

Opinion filed November 6, 1976.

*Jack Scott McInteer,* of Curfman, Brainerd, Harris, Bell, Weigand & Depew, of Wichita, argued the cause, and *Spencer L. Depew,* of the same firm was with him on the brief for the appellants.

*Norbert R. Dreiling,* of Dreiling, Bieker & Kelley, of Hays, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: Action was brought in the trial court to obtain partial cancellation of an oil and gas lease covering 160 acres of land in Graham County, Kansas. The plaintiff, lessor, alleged that the present owners of the lease had failed to fulfill the implied covenants in the lease which require further development under the prudent operator test.

The action was fully tried by experienced counsel before a seasoned trial judge. As might be expected the testimony of the competing experts in the case was in sharp conflict as to need for further development. At the conclusion of the trial the judge made written findings of fact and conclusions of law which cover ten pages of the record. The court entered an alternative decree in favor of the lessor requiring further development or partial cancellation. We will discuss this decree in more detail later.

The present owners of the lease, King Oil Company and T. Warren Hall, have appealed to this court. They argue four points on appeal (1) no substantial supporting evidence, (2) findings inadequate to support the decree, (3) error in failing to recognize the controlling effect of spacing and proration regulations, and (4) inequitable refusal of the lessor to agree to unitization and secondary recovery.

This is essentially a fact case. The case law in Kansas adequately covers the questions of law raised on appeal. So we must examine the evidence in the record in light of our previous decisions to determine if the findings and conclusions of the trial court are adequately supported by the evidence and the law.

In reviewing the findings to determine if they are supported by substantial evidence this court considers the evidence favorable to the successful party. (*Fox v. Wilson*, 211 Kan. 563, Syl. ¶ 6, 507 P. 2d 252.) If there is substantial evidence to support the findings it is of no consequence there may have been contrary evidence adduced which, if believed, would have supported different findings. (*Farmers State Bank of Ingalls v. Conrardy*, 215 Kan. 334, Syl. ¶ 1, 524 P. 2d 690.) A reviewing court does not pass on the credibility of witnesses or the truth of their testimony. Substantial evidence means evidence possessing something of substance and relevant consequence, and which furnishes substantial basis of fact from which the issues can reasonably be resolved. (*Mann v. Good*, 202 Kan. 631, Syl. ¶ 2, 451 P. 2d 233.)

The oil and gas lease in the present case was executed by plaintiff on a standard form (Form 88—[Producers] 1-43 B) which contains no agreement or express covenant as to additional development in event of production. In such case the law implies a covenant to continue development with reasonable diligence until a sufficient number of wells are drilled to reasonably secure the oil and gas underlying the premises. The cases which have recognized the implied covenants to develop the premises are collected in *Renner v. Monsanto Chemical Co.*, 187 Kan. 158, 166, 354 P. 2d 326. In *Renner* it is recognized that the implied covenant to drill additional wells and reasonably secure the oil and gas underlying the premises in commercial quantities is independent and distinct from the implied covenant or duty of the lessee to protect against drainage by drilling offset wells. Each such covenant may be a basis for requiring the lessee to drill additional wells on the leased premises. Under the implied covenant of reasonable development when oil in paying quantities becomes apparent and the number of wells to be drilled on the lease is not specified, there is an implied obligation on the lessee to continue development of the leased premises by drilling as many wells as reasonably necessary to secure the oil for the common good of both the lessor and the lessee. (*Temple v. Continental Oil Co.*, 182 Kan. 213, 320 P. 2d 1039, reh. den. 183 Kan. 471, 328 P. 2d 358.) Under the implied covenant to protect against drainage, because of the fluidity of oil and the likelihood of its being withdrawn from the leased premises by the operation of wells on adjoining lands, a more rigid duty is imposed upon the lessee to protect the

premises from substantial drainage. The lessee is obligated to drill sufficient wells at proper locations adjacent to the lease boundary at such points opposite producing well locations on adjoining lands to protect the premises from substantial drainage. (*Renner v. Monsanto Chemical Co.*, supra.)

Whether a lessee has performed the duties imposed by these implied covenants is a question of fact. The extent of the duties required of a lessee is measured by what is referred to as "the prudent operator test". Under the prudent operator test the lessee must continue reasonable development of the leased premises to secure the oil for the common advantage of both lessor and lessee and may be expected and required to do that which an operator of ordinary prudence would do to develop and protect the interests of the parties. (*Fischer v. Magnolia Petroleum Co.*, 156 Kan. 367, 133 P. 2d 95.) The large expense incident to exploration and development, combined with the additional fact the lessee must bear the loss of unsuccessful exploration and development, justifies the lessee in exercising caution with regard to his own economic interests, as well as the interests of the lessor. A lessee is under no duty to undertake development which is unprofitable to him just because it might result in some profit to the lessor. (*Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 295, 110 P. 2d 810.)

In *Sanders v. Birmingham*, 214 Kan. 769, 522 P. 2d 959, this court set forth some of the salient factors to be considered in applying the prudent operator rule in an action for partial cancellation of an oil and gas lease. It is there stated:

". . . Some of the factors which have been suggested for consideration by the Kansas decisions are the following: The quantity of oil and gas capable of being produced from the premises as indicated by prior exploration and development; the local market and demand therefor; the extent and results of the operations, if any, on adjacent lands; the character of the natural reservoir—whether such as to permit the drainage of a large area by each well—and the usages of the business. Among the economic factors to be considered are the cost of drilling, equipment and operation of wells; cost of transportation, cost of storage, the prevailing price; general market conditions as influenced by supply and demand or by regulation of production through governmental agencies. (*Fischer v. Magnolia Petroleum Co.*, supra, citing 2 Summers Oil and Gas, Perm. ed., pp. 377, 378.) In the various cases the emphasis has shifted from one factor to another depending on the particular factual circumstances in each case." (p. 776.)

Now let us turn to the facts of this case. The plaintiff-appellee, David Rush, owns the land covered by the oil and gas lease which

is involved in this litigation. The lease is referred to as the Dave Rush "A" lease and covers 160 acres located in an oil field in Graham County, Kansas, referred to as the "High Hill Field". At the trial a map of the area was admitted in evidence as defendant's exhibit No. 2 which will be helpful. It is set out below.

As shown by this map various other leases cover portions of this High Hill Field including a lease called the Dave Rush "B" lease, which lease is not directly involved in this action. The leases were obtained by and the wells were drilled for Don Pratt. Three wells were drilled on the Dave Rush "A" lease in 1967 and 1968. The discovery well of the High Hill Field is located in the northeast corner of the Dave Rush "A" lease. The legal description of the entire lease covers the S½ of the NW¼ and the N½ of the SW¼ of Section 20, Township 10 south, Range 24 west of the 6 pm. Since the lease covered a square acreage of 160 acres the witnesses at the trial referred to locations within the lease as being on the northeast, northwest, southwest, or southeast 40 acres of the lease. Such references do not refer to the legal description, rather they indicate the location of a particular 40 acres with reference to the square 160 acres covered by the lease. We will continue the pattern set by the witnesses and disregard exact legal descriptions unless we specifically designate otherwise.

The second well drilled on the Dave Rush "A" lease was located in the SW 10 acres of the NE 40 acres of the lease. It produced for a time but was being converted by defendants-appellants (King Oil Company and T. Warren Hall) into a water injection well. The third well was drilled on the SE 40 acres of the lease and was a dry hole. The present status of these and other wells in the field may be determined from the legend appearing on the map reproduced herein.

King Oil Company purchased the leases covering the major portion of this field from Don Pratt and his associates in the spring of 1970. No drilling has been attempted by King Oil Company and no wells have been drilled since 1968. Demand for additional development was made by David Rush. King Oil Company refused to drill, claiming a waterflood program for secondary recovery was the only feasible method to recover the oil. Rush refused to sign a unitization agreement. The die was cast and this action followed.

At the conclusion of the trial, after amending the original findings and conclusions, the trial court entered an alternative decree. This final decree was concerned with two separate matters. The first was the conversion of the Dave Rush "A" No. 2 well into a water injection well. In this regard it was ordered:

"c. The defendants will be granted 90 days from this date to complete the Dave Rush "A-2" as a water injection well or the same will be regarded

as abandoned. Such completion will not affect adversely any appeal rights of defendants herein."

None of the points raised in this appeal speaks directly to that part of the judgment.

The second matter concerned further drilling. In this regard the substance of the alternative decree and amendment was to order four additional locations to be drilled. The first was to be drilled on the NE 10 acres of the NW 40 acres of the lease (two 10 acre locations west of the Dave Rush "A" 1 well). The second was to be drilled on the NW 10 acres of the NE 40 acres of the lease (one 10 acre location west of the Dave Rush "A" 1 well). The third was to be drilled on the SE 10 acres of the NE 40 acres of the lease (one 10 acre location south of the Dave Rush "A" 1 well). The fourth was to be drilled on the south 20 acres of the SE 40 acres of the lease and to offset the G. Rush Estate "A" 1 well. This location would be three 10 acre locations south of the Dave Rush "A" 1 well.

The trial court recognized appellant's continued right to the producing well, Dave Rush "A" No. 1 and excepted 10 acres in a square immediately surrounding said well from cancellation under the alternative decree.

The trial court conditioned the required test drilling as follows:

"d. The court retains jurisdiction and reserves ruling on the identity of specific locations for further development after the first test which will be drilled within 60 days on the Northeast Quarter of the Southwest Quarter of the Northwest Quarter (NE/4 SW/4 NW/4) of Section Twenty (20), Township Ten (10) South, Range Twenty-four (24) West of the 6th P. M., and will, in furtherance thereof, consider reception of additional facts after said first test which would, in the opinion of both or either of the parties affect materially the drilling pattern for further development on said involved oil and gas lease from the order of priority set forth in 'Findings of Fact' # 14 and 'Conclusions of Law' # 6."

Now before considering the specific points raised let us turn to the evidence on which plaintiff-appellee relies. The plaintiff relied on the testimony of an expert witness, Walter H. Martz, who was a petroleum geologist of 23 years experience. He had worked in this particular area and had completed a study of the High Hill Field. The purpose of the study was to determine, based on his opinion, whether there was a reasonable basis for requiring further development on the Dave Rush "A" lease. He laid a foundation for and introduced two subsurface geological maps con-

toured on top of the Lansing-Kansas City formation based upon log data from all the wells drilled in the field. These maps showed the discovery well, Dave Rush "A" 1, to be the highest well in the field at a minus elevation of 1300 feet below sea level. He testified that he would expect a well drilled anywhere between the 1300 and 1310 contour lines on the map to produce oil in paying quantities. The producing wells in the area were drilled on elevations which varied from a minus 1300 to minus 1323. The witness further testified there was a reasonable basis in the information available from this field to expect commercial oil possibilities for wells drilled on elevations between —1310 and —1320. He testified if no more test wells are drilled on the west 80 acres of the Dave Rush "A" lease the oil is just going to sit there from now on until it is drilled. He mentioned the suggested drilling locations on this lease in an order of preference and stated the order of preference might change depending on the results and information obtained from the first test well. He testified as to the cumulative production of the various leases in the field as well as the production from particular wells. He testified production might be expected in paying quantities from the locations recommended when he considered the present price of oil, the reasonably expected quantity recoverable, and the costs of drilling and producing. He further testified that the limited water injection initiated by King Oil Company in this field had failed to show any appreciable increase in production.

Leo J. Dreiling was the second expert who testified for plaintiff. His company had drilled all of the wells in the High Hill Field for Don Pratt, the original lessee, except two. His drilling experience in this area included other oil fields in Sheridan, Rooks, Russell, Ellis, and Trego counties and spanned a period of 23 years. He testified as an experienced operator of oil leases that any reasonably prudent operator after drilling the wells now producing in High Hill Field would not hesitate to drill more wells. He suggested the locations on the Dave Rush "A" lease where he thought a reasonably prudent operator would drill, including the offset to the G. Rush Estate "B" 1 well. His suggested locations followed closely those proposed by Mr. Martz. In addition he gave testimony on the costs of drilling, equipping and producing a well in this field. He indicated any well which produced 15,000 barrels of oil or more would be economically profitable since oil was being sold from present wells on the lease for $5.17 a barrel. He stated that any oil which could be obtained and classified as new oil might bring $11.00 a barrel.

Production from the High Hill Field wells varied but cumulative production established for wells centrally located in the minus 1300 to 1310 elevations were as follows: Hobbs "A" 2—48,000 barrels; G. Rush Estate "B" 3—78,119 barrels; G. Rush Estate "B" 1—139,276; Dave Rush "A" 1—166,445 barrels; Dave Rush "A" 2—6,880 barrels; G. Rush Estate "C" 2—59,596 barrels. Production from wells drilled or located in the minus 1311 to 1323 elevations varied from zero to 3728 barrels.

After reviewing the evidence in the record including the testimony of the above experts we can only conclude there is substantial evidence in the record from which the trial court could properly find the defendants had failed to continue development of the leased premises, had failed to drill as many wells as was reasonably necessary to secure the oil for the common good and had failed to protect the leased premises from drainage.

The appellants list the factors having a bearing on the need for further development of an oil lease which this court suggested in *Sanders v. Birmingham,* supra, and argue that some of the factors suggested were not supported by plaintiff's evidence. It was pointed out in *Sanders* that in the cases coming before the courts the emphasis has shifted from one factor to another depending on the particular factual circumstances of each case. *Sanders* does not require all the suggested factors be covered in the evidence.

Appellant contends the judgment does not adequately advise of the reasons for the decision nor of the standards applied. As to the latter, the testimony in the record clearly establishes that the trial judge was aware of the "reasonably prudent operator" standard. This standard was referred to in the testimony presented by plaintiff's witnesses. The court's failure to mention it in the findings is not reversible error. In *Nauman v. Kenosha Auto Transport Co.,* 186 Kan. 305, 349 P. 2d 931, it is stated:

"A general finding made by a trial court determines every controverted question of fact in support of which evidence has been introduced, and a general finding by the trial court raises a presumption that it found all facts necessary to sustain and support the judgment." (Syl. ¶ 2.) (See also *Denison Mutual Telephone Co. v. Kendall,* 195 Kan. 227, 230, 403 P. 2d 1011.)

The implied covenant to develop a lease, recognized in Kansas, is measured by the "reasonably prudent operator" test. The finding by the trial court that defendants breached this covenant necessarily includes a finding that they did not meet the standard required. When it is apparent from the record that the trial court was aware

of the test required the trial court will be presumed to have applied this test unless the contrary is shown.

Appellant's third point on appeal is that the trial court failed to consider the effect of the Corporation Commission's proration order concerning the High Hill Field. The pertinent order from that agency, Docket No. 81,087-C (C-13,405) adopted a twenty acre spacing in the High Hill Pool. The Administrative Interpretation of Rule 82-2-109-D (I) provides in part:

"(d) The completion of a commercial oil well approximately in the center of a 20-acre tract is deemed to prove that all of such 20 acres is productive of crude oil until the contrary is established by the evidence presented at a hearing with respect thereto or by the drilling of a noncommercial or dry hole within the borders of such tract.

* * * * * *

"(h) Acreage is attributed to wells primarily for the purpose of protecting correlative rights, although the allocation of the pool's allowable to the wells within the pool is generally inseparably connected with the prevention of waste. Consequently, productivities and acreage are used in conjunction with each other for the purpose of fixing well allowables, that is, the well's just and equitable share of the oil which is being currently produced by the pool. Drainage which is not equalized by counter drainage is reasonably avoided by the utilization of these factors.

* * * * * *

"(j) The attribution of a specific acreage factor to a well, the designation of specified acreage as being attributable thereto and the computation of the well's allowable in part by the use of such factor do not constitute a finding that the well will adequately and efficiently drain the tract assigned to it; but such acts do constitute a finding that such well will adequately and efficiently drain an area equal to the size of the tract assigned to it. Designated acreage is assigned to wells for the purpose of recognizing that the concentration of development within the most productive portions of leases does not obtain a representative sampling of all the productive portions thereof. In order to make the allowables established for all of the wells upon such leases reflect relative abilities and thereby protect correlative rights as between developed leases, specific acreage is, however, designated as being attributable to each well.

"(k) Acreage once attributed to a well cannot thereafter be attributed to another well unless the Commission should order otherwise. However, the completion of a well within the borders of a tract, all of whose acreage has been allocated to another well, causes a readjustment of acreage factors in conformance with the revised status of the lease."

The appellant assigns two effects to these regulations. First, the order constitutes a finding, binding on the plaintiff, that each producing well will adequately and efficiently drain twenty acres. The second is that the order prevents any increase in production

allowable if a well were drilled upon the locations indicated by plaintiff, to the extent that such locations are within acreage presently attributable to the Dave Rush "A" 1 or "A" 2 well. Because of the proximity to the Dave Rush "A" 1 well of two of the proposed sites, appellants maintain this would be an equivalent to drilling on a ten-acre spacing. Thus, even if a new well were drilled, the acreage would be divided in half and each well would have an allowable production of one half the present allowable production of the Dave Rush "A" 1.

The question has been thoroughly discussed and resolved by this court in *Renner v. Monsanto Chemical Co.,* supra. In that case defendants contended that under the state proration laws and the proration orders of the State Corporation Commission, the commission attributed all of the acreage of the leases to the existing wells under 20 acre spacing. Therefore, they argued, the lease was fully developed. This court rejected their contention. The court found the State Corporation Commission orders did not "restrict nor relieve the obligations of the implied covenants of an oil and gas lease."

In *Renner* this court examined the Oil Conservation Statute ( G. S. 1949, 55-601, *et seq.,* as amended ) which is basically the same statute as is currently in force ( K. S. A. 55-601, *et seq.* ) and considered its effect on implied covenants. There we state:

"The commission has limited jurisdiction, and only that conferred by statute (*Bennett v. Corporation Commission,* supra [157 Kan. 589, 142 P. 2d 810, 150 A. L. R. 1140]). The statute did not authorize the commission to regulate the spacing of wells or to establish drilling units ( 1 Summers, *op. cit.* supra, § 83.10, p. 303); it provided only that, in fixing allowables, the commission give consideration, among other things, to the acreage factor, that is, the acreage of an owner which is reasonably attributable to each of his wells. Acreage is attributed to a well primarily for the purpose of protecting correlative rights, and productivity (commonly called potential) and acreage are used in conjunction with each other for the purpose of fixing a well's allowable. The attribution of specific acreage for that purpose does not constitute a finding that the well will adequately and effectively drain the tract assigned to it; it only determines that such a well will adequately drain an area equal to the size of the tract assigned (State Corporation Commission's General Rules and Regulations, 82-2-109 D [I], and Administrative Interpretations *h, j,* and *k,* pp. 23, 24, adopted July 1958 and filed in the office of revisor of statutes [G. S. 1949, 77-405, *et seq.*]). Drainage is always radial from the well bore and where, as here, some 20-acre well spacings bordering the lease line are rectangular and some are triangular and the well on each is not located in the center, physical factors demonstrate that uncompensated drainage will occur.

"We think it clear that, from a consideration of the statute, oil proration orders of the commission do not in any manner alter the lessee's obligation under the implied covenant to drill additional wells to protect the premises against drainage. Manifestly, the statute provides no basis for the supersession of that duty, and affords no inference that a landowner must submit to uncompensated drainage without the possibility of exacting protection from his lessee. The duty to drill wells under the covenant is not changed since proration involves only the restriction of production after the wells are drilled.

"The purpose of the order attributing specific acreage to the south four Renner wells was only to establish a proration formula for each well to insure its fair share of the state's market for crude oil produced from the Cooper Field, and it did not constitute a finding that those wells would adequately and effectively drain the acreage attributed, or preclude judicial review of the plaintiffs' claim of a breach of the implied covenant to protect the premises against drainage." ( 187 Kan. pp. 171-172. )

The court also spoke to the problem of attributing acreage to a subsequent well once it has been attributed to an existing one:

". . . The fact that acreage once attributed to an existing well cannot thereafter be attributed to another well unless the commission shall order otherwise does not affect this situation. Under the rules of the commission previously referred to, the completion of a new well on the tract in question would cause only a readjustment of the acreage factor in conformity with the revised status of the lease." ( 187 Kan. p. 172. )

The purpose of the statute ( K. S. A. 55-601, *et seq.* ) is not to give the corporation commission the power to regulate development but rather to prevent waste and the unfair or inequitable taking of oil from any pool. ( *Bennett v. Corporation Commission,* 157 Kan. 589, 142 P. 2d 810, 150 A. L. R. 1140; *Aylward Production Corp. v. Corporation Commission,* 162 Kan. 428, 176 P. 2d 861. ) The orders of the commission in this regard do not preclude judicial review of a claim based on a breach of the implied covenants in an oil and gas lease.

Included in the statutes referred to is K. S. A. 55-606, which provides, "Any rule, regulation, order or decision of the commission may be superseded by the district court upon such terms and conditions as it may deem proper." The reasoning in *Renner* controls here and the district court's order is not invalidated by the corporation commission's proration rulings.

The district court in its revised alternative decree directed appellants to drill a well at a specified 10 acre location on the lease and commence the same within 60 days. Three additional drilling locations were identified as necessary to complete reasonably prudent development of the entire lease. The court retained

jurisdiction of the case and reserved "ruling on the identity of specific locations" of the three additional drilling locations. It stated that after the first test well was completed any additional evidence which might materially affect the drilling pattern on future development of the lease would be received. The appellants question the reasonableness of such an order and urge this court to reverse the alternative decree as being inequitable and unjust.

The type of decree entered in this case is not without precedent. In *Brown v. Oil Co.*, 114 Kan. 166, 217 Pac. 286, this court reversed an order of the trial court and remanded the case for further proceedings. On remand the trial court was directed to require the lessee to select and designate particular 40 acre tracts on which they proposed to begin exploration and development. It was suggested, as to the tracts selected, the lessees be required to commence development within 90 days and when the first such test had been completed with reasonable diligence successive 40 acre tracts should be selected and explored on a 90 day timetable until all such tracts selected had been tested.

In *Webb v. Croft*, 120 Kan. 654, 244 Pac. 1033, successive locations for drilling and exploration on a 580 acre lease were ordered on a timetable which required the drilling of at least one 80 acre tract each year until the acreage was fully explored. This alternative decree was affirmed on appeal.

In *Storm v. Barbara Oil Co.*, 177 Kan. 589, 282 P. 2d 417, an alternative decree required commencement of an oil or gas test well within 90 days, the same to be completed with due diligence, and thereafter such further development as reasonably prudent, subject to the further order of the court. The trial court retained jurisdiction to make such further orders as might be necessary. The decree was affirmed on appeal.

In *Stamper v. Jones*, 188 Kan. 626, 364 P. 2d 972, under slightly different but analogous circumstances, one action was brought to require further development on each of six separate but adjacent 80 acre leases. This court approved an alternative decree with modification. The opinion modifying the decree had the effect of requiring successive drilling and exploration on designated portions of all six leases at reasonable intervals to be determined by the trial court.

An alternative decree ordered by a court of equity for further development of an oil and gas lease should be conditioned on re-

quirements of development which are reasonable and just under the facts and circumstances of the particular case (*Webb v. Croft,* supra) and the court is authorized to require the lessee to drill and develop the lease on lessor's land within a reasonable time under penalty of cancellation. (*Howerton v. Gas Co.,* 82 Kan. 367, Syl. 4, 108 Pac. 813.)

After reviewing the alternative decrees approved in the foregoing cases we do not find that the alternative decree in the present case to be inequitable or unjust. The evidence in the record supports the need for further development under the reasonably prudent operator test. The drilling of a test well on the first location is not an unreasonable burden upon the lessees. It is quite proper for the trial court to retain jurisdiction. If the first test well turns out to be a commercial producer the lessor should not be required to prosecute separate and successive actions to obtain full development of this one 160 acre lease.

The final point raised by appellants concerns appellee's refusal to participate in a proposed unitization program. They argue that appellee should be barred from equitable relief by the unclean hands doctrine and he should not be permitted to refuse to engage in secondary recovery, yet demand the drilling of more wells.

In *Vonfeldt v. Hanes,* 196 Kan. 719, 414 P. 2d 7, we examined a similar contention and made the following observation:

"The defendant testified he had no present plans for drilling, and that he would only consider drilling on the east 80 acres in relation to a secondary recovery operation for both leases. He principally complains that plaintiff had not indicated any desire or inclination to join with him in a secondary recovery operation. He cites no authority that plaintiff is under any obligation or duty to cooperate in such an operation. . . . It seems obvious that, in view of the extensive litigation, the district court concluded it was somewhat incongruous for the defendant to insist that the plaintiff and he should go into business together. . . ." (p. 723.)

Under the facts of this case the lessor was under no legal duty to unitize his land with other leases in the area in order to facilitate a secondary recovery operation urged by the lessees.

Appellants insist that unitization was necessary because the area of the High Hill Field had been virtually depleted by primary recovery. The testimony of Martz and Dreiling was to the contrary. Their testimony established the necessity for drilling additional tests to properly develop the remaining acreage and to protect against drainage. Martz testified that if no more test wells are drilled on the west eighty acres of the lease the oil underlying that

portion of the lease would remain untapped and undeveloped until someone drills in that area. The trial court relied heavily upon the testimony of these two witnesses and their testimony supports the findings.

The only drilling undertaken on this lease was completed in 1967 and 1968. The appellant, King Oil Company, purchased the controlling interest in the lease in 1970. When this action was filed in 1974, King Oil Company had not attempted further exploration and it insisted that further drilling was economically unfeasible. The plaintiff's evidence was sufficient to support the trial court's findings to the contrary. The findings justified the provisions of the alternative decree.

The judgment is affirmed.