(677 P.2d 1019)
No. 55,354

MICHAEL J. STEVENS, *Appellee,* v. JAYHAWK REALTY CO., INC., and FOREST TENNANT, *Appellants.*

Opinion filed February 23, 1984.

*Charles E. Orcutt,* of Hutchinson, and *Robert C. Brown,* of Smith, Shay, Farmer & Wetta, of Wichita, for the appellants.

*Charles K. Hyter,* of Hutchinson, for the appellee.

Before MEYER, P.J., ABBOTT and SWINEHART, JJ.

SWINEHART, J.: Defendants Forest Tennant, real estate broker, and Jayhawk Realty Co., Inc., appeal from a jury verdict finding them guilty of fraud and breach of a fiduciary duty owed plaintiff Michael Stevens, a prospective purchaser.

TransAmerica Oil Corporation, Harold Brown and Beverly Brown (TransAmerica) experienced financial difficulties in 1979 and were sued in the United States District Court by a creditor,

the Philadelphia Bourse, Inc. As a consequence of that litigation, parties to the suit entered into a stipulation agreement which, among other matters, established a committee to participate in the sale of real property belonging to TransAmerica. This property included the principal offices of TransAmerica, a machine shop, other buildings, and vacant tracts of land. The committee consisted of four attorneys, one of whom, Jim Gilliland, practiced in Hutchinson. This committee was empowered to negotiate the sale of the properties in question upon approval by a majority of its members, subject, however, to the final approval of TransAmerica. TransAmerica listed the property for sale with Jayhawk Realty Co., Inc., of which Forest Tennant was president. Beverly Brown of TransAmerica was a younger sister of Tennant's first wife. TransAmerica wished to keep its office building if at all possible.

Prior to the listing of the properties for sale, two independent realtors were employed to submit their individual appraisals of the properties. On July 19, 1979, John Oswald, a real estate broker, determined the value of the TransAmerica properties to be $172,000. On July 20, 1979, Everett Harman, a real estate broker, determined the value of the same properties to be $190,000. In 1977, E. E. Frizzel, an appraiser, had valued the properties at $304,620 for mortgage purposes.

Michael Stevens, plaintiff, was interested in purchasing the TransAmerica properties, and retained the services of John Oswald, a broker not employed by Jayhawk, to act as his agent for this purpose. On September 24, 1979, plaintiff submitted his initial written offer in the amount of $190,000 to purchase the real estate. This offer was presented by John Oswald, plaintiff's agent, to defendant Tennant, seller's agent, and was presented by Tennant to the committee. On September 27, 1979, the committee formally rejected plaintiff's first offer.

On October 1, 1979, the committee received via Tennant an offer of $95,000 for a portion of the real estate from George Casement, not a party to this lawsuit. The committee rejected this offer as well. Casement then requested Tennant's help in acquiring the real estate in which he was interested. Tennant agreed to make an offer in conjunction with Casement's offer for the balance of the TransAmerica properties.

On the morning of October 2, 1979, plaintiff submitted his second written offer, in the amount of $210,000. This offer was conveyed as the first had been; via plaintiff's agent Oswald to

Tennant and from Tennant to the committee representative, attorney Jim Gilliland. After Tennant presented plaintiff's offer for $210,000, he asked Gilliland whether the offer would be acceptable. Gilliland replied that the offer would probably be acceptable to at least two of the four committee members. Tennant then tendered his personal offer of $116,000 coupled with Casement's offer of $95,000, for a total of $211,000. Prior to this presentment, Tennant had fully disclosed to Gilliland his personal interest in the offer and had asked Gilliland whether he saw anything unethical or inappropriate about such a procedure. Gilliland had replied in the negative. Gilliland was aware that Tennant was related to the Browns, and that Tennant was willing to consider working with TransAmerica on a repurchase or buy-out of the main office building.

Around noon of that day, Oswald, plaintiff's agent, saw Gilliland and inquired about the status of plaintiff's offer of $210,000. Gilliland then told Oswald of the Tennant/Casement offer for $211,000. Oswald called Jayhawk in an attempt to retract plaintiff's second offer of $210,000 so it could be raised to $212,000. Conflicting evidence was offered of the contents of the several phone calls which followed. Oswald alleges he was led to believe that he could not retract plaintiff's second offer or submit an amended or third offer, and that plaintiff's offer of $210,000 would have to be accepted or rejected in its then present form. Although plaintiff was willing to offer $212,000, no such written offer in that amount was ever submitted to the committee. Due to the above-mentioned phone calls, the committee was made aware of plaintiff's willingness to . offer $212,000 before it took action on plaintiff's second written offer of $210,000, or on the Tennant/Casement offer of $211,000. TransAmerica, the landowner, was also aware of plaintiff's willingness to offer $212,000, but was not willing to accept any offers made by plaintiff of less than $400,000.

The next day, October 3, 1979, the committee voted unanimously to accept the Tennant/Casement offer of $211,000. On or after October 5, 1979, Tennant sold one of the parcels he had purchased from TransAmerica to Maize Building Corporation for $95,000. On January 25, 1980, Tennant sold his remaining parcel to its previous owner, TransAmerica, for $39,000. Since Tennant had spent $116,000 to purchase the property and had regained

$134,000 from selling the property, he gained $18,000 on the transaction.

On November 6, 1979, plaintiff filed suit against defendants Tennant and Jayhawk. The jury found for plaintiff on both theories of fraud and breach of fiduciary duty. Actual damages of $15,000 were found and punitive damages of $22,000 were assessed. Defendants have timely appealed to this court.

Defendants raise three issues on appeal: (1) Did the trial court err in its instructions to the jury concerning the fiduciary duty owed by a real estate broker, representing the seller, to a prospective purchaser? (2) Does sufficient evidence support the jury's verdict regarding fraud on the part of either or both defendants? (3) Did the trial court err in failing to set aside the award of actual or punitive damages?

Defendants first argue that the trial court erred in giving jury instructions numbered 14, 15, and 22, which concern the fiduciary duty of a real estate broker.

Instruction No. 14 states, in relevant part:

"You are instructed that the plaintiff seeks to recover under one of two alternate theories:

. . . . .

"2. The plaintiff's second theory upon which he seeks recovery is that the defendant, or either of them, owed a fiduciary duty to the plaintiff and that this duty was breached when the defendants, or either of them, submitted an offer to purchase of $1,000.00 more than the plaintiff and then prevented the submission of further offers by the plaintiff."

This instruction does not attempt to instruct the jury as to Kansas law. Rather, it simply and accurately informs them as to what plaintiff's theories of recovery were. This cannot be considered reversible error.

Instruction No. 22 states:

"The real estate broker-seller relationship is a fiduciary one demanding conditions of trust and confidence which require of the agent the same obligation of individual service and loyalty as is imposed upon a trustee in favor of his beneficiary.

"A real estate broker is bound to act with utmost good faith towards his seller and to keep him informed of facts affecting the seller's interests.

"The extent to which a broker must relay information to his principal rests upon the facts in each particular case."

This instruction accurately defines the broker-seller relationship, as was recently set out in *Marcotte Realty & Auction, Inc.*

*v. Schumacher,* 229 Kan. 252, 624 P.2d 420 (1981). The instruction clearly and repeatedly states that its application is to brokers and sellers. No implication was made that this instruction applied to brokers and prospective purchasers. It is undisputed that defendants were the agent of sellers. The instruction on defendants' duty to the sellers may have been relevant in limiting the scope of defendants' duty to plaintiff, prospective purchaser. See *Marcotte,* 229 Kan. 252, Syl. ¶¶ 7, 8; *Ellis v. Flink,* 374 So. 2d 4 (Fla. 1979). (A broker employed by one party is not bound to disclose everything he knows to the other party. Indeed, his duty of loyalty to his principal may well preclude his doing so.) Instruction No. 22 is an accurate statement of Kansas law. The court's giving of this instruction was not erroneous.

Instruction No. 15 repeats plaintiff's claim that he suffered damages due to defendants' fraudulent conduct or breach of a fiduciary duty owed him, lists the essential elements of fraud, and defines the terms "material representation" and "fiduciary relationship." Defendants do not argue, and it does not appear, that these parts of the instruction are erroneous. The part of the instruction to which defendants object is as follows:

"If you find that a fiduciary relationship exists between the plaintiff and the defendants, or either of the defendants, then you must determine whether or not a fiduciary duty is owing under that fiduciary relationship. Where a fiduciary relationship exists, it is the duty of the person in whom the confidence is placed to exercise good faith in the transaction, and to refrain from abusing such confidence by obtaining any advantage to himself at the expense of the confiding party.

"If you determine that there was a fiduciary duty owing from the defendants, or either defendant, to the plaintiff, then you must determine whether or not there was a breach of that fiduciary duty."

Although the court did not state that a fiduciary relationship existed between plaintiff and defendants, the giving of instruction No. 15 implied that such a relationship was possible under Kansas law, and that whether such a relationship existed in this case was a question of fact for the jury. Where a fiduciary relationship exists between the parties, it is the duty of the agent to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal. *George v. Bolen-Williams, Realtors,* 2 Kan. App. 2d 385, 388, 580 P.2d 1357 (1978).

Research has revealed one Kansas case which has found a

fiduciary relationship to exist between a real estate broker or salesperson and a prospective purchaser. In *George v. Bolen-Williams, Realtors,* 2 Kan. App. 2d 385, this court found a principal-agent relationship and its corresponding fiduciary duties between plaintiff, a prospective purchaser, and defendant realtors. In that case we stated:

" 'The primary relation, as between customer and real estate broker, is that of agency, and the general rules of law applicable to principal and agent govern their rights and liabilities. Furthermore, agency can result only from contract, express or implied, and in determining whether a valid contract has been entered into, the rules which pertain to contracts generally are applicable. There must be consideration, mutuality and a meeting of the minds as to essential matters. Meeting of the minds may be shown by implication, by conduct of the parties. Like other features essential to a cause of action, the burden of establishing agency is upon the party asserting it. (*Patee v. Moody,* 166 Kan. 198, 199 P.2d 798.)' *Hiniger v. Judy,* 194 Kan. 155, 158, 398 P.2d 305 (1965)." p. 388.

In *George* this court found an implied contract giving rise to a principal-agent relationship by the prospective purchaser initially contacting the realtor concerning the purchase of certain unlisted property, and his communication to the realtor of his intention to buy the property if a sale could be arranged within a certain price range. The realtor breached the fiduciary duty owed the prospective purchaser by obtaining a listing of the property the prospective purchaser desired to purchase, failing to notify the prospective purchaser of that listing, and allowing the realtor's partners to purchase the property.

Our scope of appellate review of this issue is clear:

" 'While the determination of what constitutes agency and whether there is any competent evidence reasonably tending to prove its existence is a question of law, the weight to be given evidence and the resolution of conflicts therein are functions of the trier of facts. . . . However, under well-established rules of appellate review this court disregards any conflicting evidence or inferences which might be drawn therefrom and accepts as true the evidence, and all inferences to be drawn therefrom, which support or tend to support the findings of the trial court. (*Farmers State Bank of Ingalls v. Conrardy,* 215 Kan. 334, 524 P.2d 690; and *Morris v. Hoesch,* 204 Kan. 735, 466 P.2d 272.)' *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, 371, 548 P.2d 719 (1976).

"Our function is to determine if the record reveals any substantial competent evidence upon which a finding of agency could be based, not to decide whether, under proper instructions relating to the law of principal and agent, it actually did exist as a matter of fact. *Carver v. Farmers & Bankers Broadcasting Corp.,* 162 Kan. 663, 672, 179 P.2d 195 (1947). The existence or non-existence of an agency relationship between these parties being a question of fact, we are limited in our review to a determination of whether the implicit jury finding that an agency

relationship did exist is supported by the evidence. *Kaw Valley State Bank & Trust Co. v. Riddle*, 219 Kan. 550, Syl. 9, 549 P.2d 927 (1976); *State v. Holt*, 221 Kan. 696, Syl. 3, 561 P.2d 435 (1977)." *George v. Bolen-Williams, Realtors*, 2 Kan. App. 2d at 388-89.

In the present case, no express contract existed between plaintiff, the prospective purchaser, and defendants, seller's agents. Nor does the record disclose the existence of an implied contract between the parties. Rather, plaintiff was at all times represented by his own agent, John Oswald. Plaintiff never contacted defendants other than through John Oswald. Defendants had no actual, apparent, or inherent authority to act on behalf of plaintiff, nor did defendants assume to act under plaintiff's authority. The only person empowered to act on plaintiff's behalf was plaintiff's agent, John Oswald. In such a case, where both the prospective purchaser and the seller had their own agents who negotiated solely on behalf of their respective principals, the evidence is insufficient to support the jury's implicit finding that an agency relationship existed between plaintiff, prospective purchaser, and defendants, seller's agents. See 12 C.J.S., Brokers § 104, p. 296. (Where the seller and buyer each have their own agent, and the buyer deals exclusively through his agent, the seller's agent at no time becomes the agent of the buyer so that an action based on theory of a breach of a fiduciary duty owed by the seller's agent to the buyer cannot be maintained.)

In Kansas real estate brokers are licensed and are required to meet high standards of honesty, trustworthiness, truthfulness, fair dealing, and competency. See K.S.A. 58-3006, 58-3007, 58-3015 (Weeks) (now repealed but replaced by similar substantive requirements in K.S.A. 58-3039, 58-3050, and 58-3062[a] [Ensley]). The underlying purpose of the Kansas Real Estate Brokers and Salesmen Act is to safeguard the interest of the public. Because of this state's high standards of qualification and its granting of a form of monopoly to realtors, this statement by the Utah Supreme Court applies to Kansas as well:

"In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and he is answerable at law for breaches of his or her statutory duty to the public." *Dugan v. Jones*, 615 P.2d 1239, 1248 (Utah 1980).

See *Zichlin v. Dill,* 157 Fla. 96, 25 So. 2d 4 (1946); *McRae v. Bolstad,* 32 Wash. App. 173, 646 P.2d 771 (1982); *Tennant v. Lawton,* 26 Wash. App. 701, 615 P.2d 1305 (1980); *Hagar v. Mobley,* 638 P.2d 127, 136 (Wyo. 1981); 12 C.J.S., Brokers § 104, p. 296.

In the présent case, it is clear that defendants owed some duty to plaintiff. However, it does not appear that the scope of defendants' duty to plaintiff, imposed by statute, is as broad as defendants' duty to plaintiff would have been had a principal-agent relationship existed between the parties. We cannot say that the giving of instruction No. 15 was harmless error.

Under the facts of this case, whether an agency relationship and any fiduciary duties could exist between plaintiff and defendants was a question of law, not of fact. The giving of instruction No. 15 was erroneous. However, at trial defendants did not object to that instruction on the ground that the instruction implied the existence of a principal-agent relationship between plaintiff and defendants.

It is well recognized that unless an instruction is clearly erroneous, no party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection. See *Iseman v. Kansas Gas & Electric Co.,* 222 Kan. 644, 567 P.2d 856 (1977); K.S.A. 60-251(*b*). An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict. See *State v. Stafford,* 223 Kan. 62, Syl. ¶ 2, 573 P.2d 970 (1977). By giving instruction No. 15, the court led the jury to believe that defendants, seller's agents, could owe a fiduciary duty to plaintiff, prospective purchaser, under Kansas law and the facts of this case. We are convinced that if this erroneous instruction had not been given, the jury would not have found defendants guilty of a breach of a fiduciary duty owed plaintiff. Accordingly, we reverse that part of the judgment.

The jury's verdict in the present case reveals that defendants were found liable not only for breach of a fiduciary duty, but also for fraud. Defendants argue that the jury's verdict that defendants were guilty of fraud is not supported by substantial evidence.

Our standard of review on appeal is:

" '[W]hen a verdict [or judgment] is attacked for insufficiency of the evidence, "the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below." *Craig v. Hamilton,* 221 Kan. 311, 313, 559 P.2d 796 (1977).' *Cantrell v. R. D. Werner Co.,* 226 Kan. 681, 684, 602 P.2d 1326 (1979)." *Marcotte Realty & Auction, Inc. v. Schumacher,* 229 Kan. at 254.

At trial and on appeal, plaintiff contends that defendants committed fraud by preventing plaintiff from submitting a third offer, thereby assuring their own purchase of the property. It is clear that such conduct can constitute actionable fraud, as these quotes clarify:

"When he acts as an intermediary between a seller and a prospective buyer, a broker is under a duty to deal fairly and honestly with the prospective buyer, as he owes a duty of honesty, candor, and fair dealing to those with whom he deals even in the absence of a principal and agent relationship between them. Accordingly, if, in negotiating a contract in behalf of a principal, the broker is guilty of fraud as to the other contracting party, he is liable to him therefor in damages . . . ." 12 C.J.S., Brokers § 107, p. 307.

"A real estate broker has the duty to transmit an offer from a third person to the owner of property, and if he fails to do so, and buys the property for his own account at a price equal to or less than the price that the prospective purchaser agreed to pay, the broker is liable to such prospective purchaser." 12 C.J.S., Brokers § 104, p. 297.

See *Harper v. Adametz,* 142 Conn. 218, 113 A.2d 136 (1955); *Klotz v. Fauber,* 213 Va. 1, 189 S.E.2d 45 (1972).

A recent Kansas case found defendant realtor (seller's agent) liable to plaintiff purchaser in fraud for failing to disclose to plaintiff the presence of termites in the house plaintiff purchased. See *Lynn v. Taylor,* 7 Kan. App. 2d 369, 642 P.2d 131, *rev. denied* 231 Kan. 801 (1982). Before a broker can be held liable to a prospective purchaser in fraud, all the elements of that cause of action must be present.

"In order that the broker may be held liable, however, all essential elements of actionable fraud or deceit must ordinarily be present, such as the falsity of the representation, guilty knowledge or scienter, an intent to deceive, or cause someone to believe a falsehood, reliance on the misrepresentation which induced the purchaser to act, actual deception, and injury or damage to the person dealing with the broker." 12 C.J.S., Brokers § 107, pp. 308-09.

We have reviewed the record to determine whether substantial evidence supports the jury's finding that defendants prevented plaintiff from submitting a third offer in the amount of $212,000 to the seller. The record reveals that John Oswald, plaintiff's agent, learned of the combined Tennant/Casement offer of $211,000 around noon on October 2, 1979, when Jim Gilliland told him of it. Plaintiff subsequently gave John Oswald verbal authorization to offer $212,000. Around 2:00 p.m. that day, Oswald called Jayhawk Realty Co., Inc., and spoke to Don Ahrens, a realtor. Mr. Ahrens told Oswald that the written offers had already been delivered to the committee and that he did not know whether plaintiff's offer of $210,000 could be returned to Oswald, and that he would contact Tennant who was then out of town. When Tennant later spoke with Ahrens, Tennant indicated that the committee had probably already met, and that plaintiff's offer of $210,000 would have to be accepted or rejected in its then present form. Mr. Ahrens called Oswald and conveyed that message to him at approximately 4:00 that afternoon.

Oswald was upset to learn that he could neither rewrite nor renegotiate plaintiff's second offer from $210,000 to $212,000. Oswald never asked if he could submit a third written offer because of his personal preference and practice not to have more than one offer from his client on the table at one time. After Oswald received this message from defendants, he called Jim Gilliland and told him that defendants would not allow plaintiff to amend or increase his offer.

The next morning, October 3, 1979, Jim Gilliland called the other three committee members and informed them of plaintiff's willingness to increase his offer to $212,000. Despite this knowledge, the committee accepted the combined Tennant/Casement offer of $211,000 instead, mainly due to the fact that Tennant had indicated his willingness to consider reselling the office building to TransAmerica.

Undisputed evidence reveals that defendants induced plaintiff's belief that he could not amend his second offer nor submit a third offer. However, before the committee decided which offer to accept it had full knowledge of plaintiff's willingness to offer $212,000. The committee's refusal to consider that proposed offer was not based upon the fact that the offer was verbal instead of written, but upon the fact that the offer had been made by a

party who had not indicated his willingness to resell part of the property purchased to the original owner, TransAmerica. In essence, plaintiff has shown no evidence that he was damaged by being precluded from modifying his second written offer or from submitting a third written offer. Plaintiff's offer would not have been accepted even if it had been in writing. Substantial evidence is not present to support all the essential elements of actionable fraud.

Because the giving of instruction No. 15 was reversible error, and because the verdict of fraud is not supported by substantial evidence, the third issue on appeal concerning actual and punitive damages is moot.

Reversed and remanded with directions to enter judgment for defendants.

ABBOTT, J., concurring: I disagree with much of the majority opinion, but agree with the result. Greatly oversimplified, the record shows that, as a matter of law, plaintiff suffered no actual damages as a result of defendants' breach of duty to him. The seller and its agents were all aware that plaintiff would pay more for the property than the offer they accepted, but chose to sell for less in hopes (since fulfilled) of later buying back a part of the real estate. Thus, plaintiff suffered no actual damages by reason of defendants' breach of duty, and so plaintiff was not entitled to punitive damages.